## BARKER v. HARVEY.

## QUEVAS v. HARVEY.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

Nos. 209, 210.   Argued March 20, 21, 1901.—Decided May 13, 1901.

The facts in these two cases are so nearly alike that the court thinks it sufficient to consider only the first.   The land there in question is within the limits of the territory ceded to the United States by the treaty of Guadalupe Hidalgo.   The plaintiffs claim title by virtue of a patent issued in confirmation of two grants made by the Mexican government. The defendants, without claiming the fee, claim a right of permanent occupancy, as Mission Indians, who had been in occupation of the premises long before the Mexican grants.   *Held:*

(1) That the United States were bound to respect the rights of private property in the ceded territory, but that it had the right to require reasonable means for determining the validity of all titles within the ceded territory, to require all persons having claims to lands to present them for recognition, and to decree that all claims which are not thus presented, shall be considered abandoned:

(2) That so far as the Indians are concerned, the land was rightfully to be regarded as part of the public domain, and subject to sale and disposition by the government:

(3) That if the Indians had any claims founded on the action of the Mexican government, they abandoned them by not presenting them to the commission for consideration:

(4) That lands which were burdened with a right of permanent occupancy were not a part of the public domain, subject to the full disposal by the United States.

Some discussion appears in the briefs as to the meaning of the word "servidumbres," (translated "usages"). The court declines to define its meaning when standing by itself, but holds that in these grants it does not mean that the general occupation and control of the property was limited by them, but only that such full control should not be taken as allowing any interference with established roads or cross roads, or other things of like nature.

THESE cases were brought by defendants in error in the superior court of the county of San Diego, California, to quiet their title to certain premises in that county.   Decrees rendered in their favor were carried to the Supreme Court of the

State, and by that court affirmed. 126 California, 262. To such affirmance these writs of error have been sued out.

The facts in the cases are so nearly alike that it is sufficient to consider only the first. The land in question is within the limits of the territory ceded to the United States by the treaty of Guadalupe Hidalgo, February 2, 1848. 9 Stat. 922. Generally speaking, the plaintiffs claim title by virtue of a patent issued to John J. Warner on January 16, 1880, in confirmation of two grants made by the Mexican government. On the other hand, the defendants do not claim a fee in the premises but only a right of permanent occupancy by virtue of the alleged fact that they are Mission Indians, so called, and had been in occupation of the premises long before the Mexican grants, and, of course, before any dominion acquired by this government over the territory ; insisting, further, that the government of Mexico had always recognized the lawfulness and permanence of their occupancy, and that such right of occupancy was protected by the terms of the treaty and the rules of international law.

The treaty of Guadalupe Hidalgo provided in article 8 as follows:

## " ARTICLE VIII.

" Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax or charge whatever.

" Those who shall prefer to remain in the said territories may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty ; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the

character of Mexicans, shall be considered to have elected to become citizens of the United States.

"In the said territories, the property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

Article 10, as originally prepared, was stricken out by the Senate, but in the protocol signed by the representatives of the two nations, at the time of the ratification, on May 26, 1848, it was stated :

"2d. The American government by suppressing the tenth article of the treaty of Guadalupe did not in any way intend to annul the grants of lands made by Mexico in the ceded territories. These grants, notwithstanding the suppression of the article of the treaty, preserve the legal value which they may possess, and the grantees may cause their legitimate (titles) to be acknowledged before the American tribunals.

"Conformably to the law of the United States, legitimate titles to every description of property, personal and real, existing in the ceded territory, are those which were legitimate titles under the Mexican law in California and New Mexico, up to the 13th of May, 1846, and in Texas up to the 2d March, 1836." Ex. Doc. No. 50 H. R. 30th Cong. 2d Sess. p. 77.

After the acquisition of this territory Congress, on March 3, 1851, c. 41, 9 Stat. 631, passed an act entitled "An act to ascertain and settle the private land claims in the State of California," which created a commission to receive and act upon all petitions for confirmation of such claims. Its decision was subject to appeal to the District Court of the United States, and thence to this court. As originally organized the commission was to continue for three years, but that time was extended by subsequent legislation. Sections 8, 13, 15 and 16 are as follows :

"SEC. 8. That each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government shall present the same to the said commissioners when sitting as a board, together with such docu-

mentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and, within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the District Attorney of the United States in and for the district in which such decision shall be rendered."

"Sec. 13. That all lands, the claims to which have been finally rejected by the commissioners in the manner herein provided, or which shall be finally decided to be invalid by the District or Supreme Court, and all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States; and for all claims finally confirmed by the said commissioners, or by the said District or Supreme Court, a patent shall issue to the claimant upon his presenting to the General Land Office an authentic certificate of such confirmation, and a plat or survey of the said land, duly certified and approved by the surveyor general of California, whose duty it shall be to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same; and in the location of the said claims the said surveyor general shall have the same power and authority as are conferred on the register of the land office and receiver of the public moneys of Louisiana, by the sixth section of the act ' to create the office of surveyor of the public lands for the State of Louisiana,' approved third March, one thousand eight hundred and thirty-one: Provided, always, That if the title of the claimant to such lands shall be contested by any other person, it shall and may be lawful for such person to present a petition to the District Judge of the United States for the district in which the lands are situated, plainly and distinctly setting forth his title thereto, and praying the said Judge to hear and determine the same, a copy of which petition shall be served upon the adverse party thirty days before the time ap-

pointed for hearing the same : And provided, further, That it shall and may be lawful for the District Judge of the United States, upon the hearing of such petition, to grant an injunction to restrain the party at whose instance the claim to the said lands has been confirmed, from suing out a patent for the same, until the title thereto shall have been finally decided, a copy of which order shall be transmitted to the Commissioner of the General Land Office, and thereupon no patent shall issue until such decision shall be made, or until sufficient time shall, in the opinion of the said Judge, have been allowed for obtaining the same; and thereafter the said injunction shall be dissolved."

" SEC. 15. That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons.

" SEC. 16. That it shall be the duty of the commissioners herein provided for to ascertain and report to the Secretary of the Interior the tenure by which the mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any kind, and also those which are occupied and cultivated by Puéblos or Rancheros Indians."

On the trial before the court, without a jury, the findings of fact were in substance that the plaintiffs had the ownership in fee simple of the premises described; that the defendants had no rights or interest therein, and the decree was in accordance therewith. The statement on appeal prepared by the trial court disclosed that the plaintiffs introduced in evidence the patent to John J. Warner, which patent recited the filing of a petition by Warner with the land commission praying for confirmation of his title, a title based on two Mexican grants—one June 8, 1840, to Jose Antonio Pico by Juan B. Alvarado, then constitutional governor of the Californias, and the second, November 28, 1844, to petitioner by Manual Micheltorena, governor general commandant and inspector general of the Californias; recited also a decree of confirmation of such title, an appeal to the District Court of the United States and an affirmance of the decision of

the commission, the return of the surveyor general of the State showing a survey; and conveyed the premises to Warner, "but with the stipulation that in virtue of the fifteenth section of the said act neither the confirmation of this claim nor this patent shall affect the interests of third persons." It was admitted that Warner's title had passed to plaintiffs, and that the taxes had all been paid by them. On the other hand, the appeal statement showed that the defendants offered copies of the expedientes of both of the grants referred to in the patent, and also oral testimony of occupation by the defendants and their ancestors. Some witnesses were introduced by the plaintiffs to contradict this matter of occupancy, but on final consideration the court struck out all the testimony in reference to occupancy and of the Mexican grants upon which the patent was issued. Upon the evidence, therefore, that was received by the trial court there could be no doubt of the rightfulness of the decree, and the question presented by the record to the Supreme Court of the State was whether there was error in striking out the testimony offered on behalf of the defence.

*Mr. Shirley C. Ward* and *Mr. Assistant Attorney General Hoyt* for plaintiffs in error.

*Mr. David L. Withington* for defendants in error. *Mr. Stephen M. White, Mr. Charles Monroe* and *Mr. Cassius Carter* were on his brief.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

Undoubtedly by the rules of international law, and in accordance with the provisions of the treaty between the Mexican government and this country, the United States were bound to respect the rights of private property in the ceded territory. But such obligation is entirely consistent with the right of this Government to provide reasonable means for determining the validity of all titles within the ceded territory, to require all persons having claims to lands to present them for recognition,

and to decree that all claims which are not thus presented shall be considered abandoned. " Undoubtedly private rights of property within the ceded territory were not affected by the change of sovereignty and jurisdiction, and were entitled to protection, whether the party had the full and absolute ownership of the land, or merely an equitable interest therein, which required some further act of the Government to vest in him a.perfect title. But the duty of providing the mode of securing these rights, and of fulfilling the obligations imposed upon the United States by the treaties, belonged to the political department of the Government; and Congress might either itself discharge that duty or delegate it to the judicial department. *De la Croix* v. *Chamberlain,* 12 Wheat. 599, 601, 602; *Chouteau* v. *Eckhart,* 2 How. 344, 374; *Tameling* v. *United States Freehold Co.,* 93 U. S. 644, 661; *Botiller* v. *Dominguez,* 130 U. S. 238." *Astiazaran* v. *Santa Rita Land & Mining Co.,* 148 U. S. 80, 81.

*Botiller* v. *Dominguez,* 130 U. S. 238, the last case cited in the foregoing quotation, deserves special notice. The Supreme Court of California had held in several cases that a perfect title need not be presented to the land commission; that it was recognized by the treaty of cession, and required no further confirmation; that the act to ascertain and settle private land claims applied only to those titles which were imperfect and needed the action of some tribunal to ascertain and establish their validity. But in this case, which came from the Supreme Court of California, we held the contrary. We quote at some length from the opinion. Thus, on page 246, it was said:

" Two propositions under this statute are presented by counsel in support of the decision of the Supreme Court of California. The first of these is, that the statute itself is invalid, as being in conflict with the provisions of the treaty with Mexico, and violating the protection which was guaranteed by it to the property of Mexican citizens, owned by them at the date of the treaty; and also in conflict with the rights of property under the Constitution and laws of the United States, so far as it may affect titles perfected under Mexico. The second proposition is, that the statute was not intended to apply to claims which were supported by a complete and perfect title from the Mexican

government, but, on the contrary, only to such as were imperfect, inchoate and equitable in their character, without being a strict legal title.

"With regard to the first of these propositions it may be said, that so far as the act of Congress is in conflict with the treaty with Mexico, that is a matter in which the court is bound to follow the statutory enactments of its own Government. If the treaty was violated by this general statute enacted for the purpose of ascertaining the validity of claims derived from the Mexican government, it was a matter of international concern, which the two States must determine by treaty, or by such other means as enables one State to enforce upon another the obligations of a treaty. This court, in a class of cases like the present, has no power to set itself up as the instrumentality for enforcing the provisions of a treaty with a foreign nation which the Government of the United States, as a sovereign power, chooses to disregard. *The Cherokee Tobacco,* 11 Wall. 616; *Taylor* v. *Morton,* 2 Curtis, 454; *Head Money Cases,* 112 U. S. 580, 598; *Whitney* v. *Robertson,* 124 U. S. 190, 195."

In reference to the second proposition, after noticing several provisions of the statute, it was declared (p. 248):

"It is not possible, therefore, from the language of this statute, to infer that there was in the minds of its framers any distinction as to the jurisdiction they were conferring upon this board, between claims derived from the Spanish or Mexican government, which were perfect under the laws of those governments, and those which were incipient, imperfect or inchoate. . . . It was equally important to the object which the United States had in the passage of it, that claims under perfect grants from the Mexican government should be established as that imperfect claims should be established or rejected.

"The superior force which is attached, in the argument of counsel, to a perfect grant from the Mexican government had its just influence in the board of commissioners or in the courts to which their decisions could be carried by appeal. If the title was perfect, it would there be decided by a court of competent jurisdiction, holding that the claim thus presented was valid; if it was not, then it was the right and the duty of that court

to determine whether it was such a claim as the United States was bound to respect, even though it was not perfect as to all the forms and proceedings under which it was derived. So that the superior value of a perfected Mexican claim had the same influence in a court of justice which is now set up for it in an action where the title is contested.

"Nor can it be said that there is anything unjust or oppressive in requiring the owner of a valid claim, in that vast wilderness of lands unclaimed, and unjustly claimed, to present his demands to a tribunal possessing all the elements of judicial functions, with a guarantee of judicial proceedings, so that his title could be established if it was found to be valid, or rejected if it was invalid.

"We are unable to see any injustice, any want of constitutional power, or any violation of the treaty, in the means by which the United States undertook to separate the lands in which it held the proprietary interest from those which belonged, either equitably or by a strict legal title, to private persons. Every person owning land or other property is at all times liable to be called into a court of justice to contest his title to it. This may be done by another individual, or by the government under which he lives. It is a necessary part of a free government, in which all are equally subject to the laws, that whoever asserts rights or exercises powers over property may be called before the proper tribunals to sustain them."

The views thus expressed have been several times reaffirmed by this court, the latest case being *Florida* v. *Furman*, 180 U. S. 402, in which, after quoting the passage last above quoted, we said, in reference to statutes of the United States respecting claims in Florida (p. 438):

"We are of opinion that these acts applied and were intended to apply to all claims, whether perfect or imperfect, in that particular resembling the California act; that the courts were bound to accept their provisions; and that there was no want of constitutional power in prescribing reasonable limitations operating to bar claims if the course pointed out were not pursued."

See also *Thompson* v. *Los Angeles Farming &c. Co.*, 180 U. S. 72, 77, in which it was said in reference to the statute before us:

"Every question which could arise on the title claimed could come to and receive judgment from this court. The scheme of adjudication was made complete and all the purposes of an act to give repose to titles were accomplished. And it was certainly the purpose of the act of 1851 to give repose to titles. It was enacted not only to fulfil our treaty obligations to individuals, but to settle and define what portion of the acquired territory was public domain. It not only permitted but required all claims to be presented to the board, and barred all from future assertion which were not presented within two years after the date of the act. Sec. 13. The jurisdiction of the board was necessarily commensurate with the purposes of its creation, and it was a jurisdiction to decide rightly or wrongly. If wrongly a corrective was afforded, as we have said, by an appeal by the claimant or by the United States to the District Court."

These rulings go far toward sustaining the decision of the Supreme Court of California in the present cases. As between the United States and Warner, the patent is as conclusive of the title of the latter as any other patent from the United States is of the title of the grantee named therein. As between the United States and the Indians, their failure to present their claims to the land commission within the time named made the land within the language of the statute "part of the public domain of the United States." "Public domain" is equivalent to "public lands," and these words have acquired a settled meaning in the legislation of this country. "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." *Newhall* v. *Sanger*, 92 U. S. 761, 763. "The grant is of alternate sections of public land, and by public land, as it has been long settled, is meant such land as is open to sale or other disposition under general laws." *Bardon* v. *Northern Pacific Railroad Co.*, 145 U. S. 535, 538. See also *Mann* v. *Tacoma Land Co.*, 153 U. S. 273, 284. So far, therefore, as these Indians are concerned the land is rightfully to be regarded as part of the public domain and subject to sale and disposal by the Government, and the Government has conveyed to Warner. It is true that the patent,

following the fifteenth section of the act, in terms provides that the patent shall not " affect the interests of third persons," but who may take advantage of this stipulation? This question was presented and determined in *Beard* v. *Federy*, 3 Wall. 478, and the court, referring to the effect of a patent, said (pp. 492, 493):

" When informed, by the action of its tribunals and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises as they are surveyed and described. As against the government this record, so long as it remains unvacated, is conclusive. . . . The term ' third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property."

If these Indians had any claims founded on the action of the Mexican government they abandoned them by not presenting them to the commission for consideration, and they could not, therefore, in the language just quoted, " resist successfully any action of the government in disposing of the property." If it be said that the Indians do not claim the fee, but only the right of occupation, and, therefore, they do not come within the provision of section 8 as persons " claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government," it may be replied that a claim of a right to permanent occupancy of land is one of far-reaching effect, and it could not well be said that lands which were burdened with a right of permanent occupancy were a part of the public domain and subject to the full disposal of the United States. There is an essential difference between the power of the United States over lands to which it has had full title, and of which it has

given to an Indian tribe a temporary occupancy, and that over
lands which were subjected by the action of some prior govern-
ment to a right of permanent occupancy, for in the latter case
the right, which is one of private property, antecedes and is
superior to the title of this government, and limits necessarily
its power of disposal. Surely a claimant would have little rea-
son for presenting to the land commission his claim to land,
and securing a confirmation of that claim, if the only result
was to transfer the naked fee to him, burdened by an Indian
right of permanent occupancy.

    Again, it is said that the Indians were, prior to the cession,
the wards of the Mexican government, and by the cession be-
came the wards of this government; that, therefore, the United
States are bound to protect their interests, and that all admin-
istration, if not all legislation, must be held to be interpreted
by, if not subordinate to, this duty of protecting the interests
of the wards. It is undoubtedly true that this government has
always recognized the fact that the Indians were its wards, and
entitled to be protected as such, and this court has uniformly
construed all legislation in the light of this recognized obliga-
tion. But the obligation is one which rests upon the political
department of the government, and this court has never as-
sumed, in the absence of Congressional action, to determine
what would have been appropriate legislation, or to decide the
claims of the Indians as though such legislation had been had.
Our attention has been called to no legislation by Congress
having special reference to these particular Indians. By the
act creating the land commission the commissioners were re-
quired (sec. 16) " to ascertain and report to the Secretary of the
Interior the tenure by which the mission lands are held, and
those held by civilized Indians, and those who are engaged in
agriculture or labor of any kind, and also those which are occu-
pied and cultivated by Pueblos or Rancheros Indians." It is
to be assumed that the commissioners performed that duty,
and that Congress, in the discharge of its obligation to the In-
dians, did all that it deemed necessary, and as no action has
been shown in reference to these particular Indians, or their
claims to these lands, it is fairly to be deduced that Congress

considered that they had no claims which called for special action.

But we are not compelled to rest upon any presumptions from the inaction of Congress. Turning to the testimony offered in respect to the matter of occupation, it may be stated that there was sufficient to call for a finding thereon if the fact of occupation was controlling. ∧ But in the Mexican grants upon which Warner based his application to the commission for a confirmation of his title we notice these things : The first grant was in 1840, to José Antonio Pico. The application was for " the place ' Agua Caliente,' belonging to the mission of San Luis Rey, since it is not needed by the said mission, having a house on it, and an orchard of little utility." The report of the justice of the peace was " that the land ' Agua Caliente ' is the property of the San Luis Rey Mission, which has improvements, buildings and an orchard, from which derive their subsistence the Indians who live thereon, which is bounded by the property of Joaquin Ortega, and I believe it can be awarded to the interested party for being worthy, but without prejudice to the Indians, who from it derive their support."

The last paper in the expediente was the following:

" *Juan B. Alvarado, Constitutional Governor of the Department of both Californias :*

" Whereas José Antonio Pico has petitioned for his own personal benefit and that of his family the land known by the name of ' Agua Caliente,' bounded by the ranch of ' San José Valley,' with the boundary of the canyon of ' Buena Vista,' and by the mountains of ' Palomar,' having previously complied with the writs and investigations corresponding, as required by the laws and regulations, exercising the powers which are conferred on me in the name of the Mexican nation, I have resolved to grant to him the said place, subjecting himself to pay for the place of worship and other improvements that be there, belonging to the San Luis Rey Mission, and not molest (prejudicar) the Indians that thereon may be established, and to the approbation of the most excellent assembly of the department, and to the conditions following, to wit :

"First. He is allowed to fence it in, without interfering with the roads, cross roads and other usages (servidumbres); he will possess it fully and exclusively, turning it to agricultural or any other use he may see fit, but within a year he shall construct a house thereon and live in it.

"Second. When the property shall have been confirmed to him, he shall petition the respective judge to give him possession thereof, by virtue of this order, and shall mark out the boundaries on whose limits he shall fix the landmarks, some fruit and wild trees that may be of some utility.

"Third. The land of which donation is hereby made is of the extent mentioned in the plan, which goes with the 'expediente.' The judge who should give possession thereof shall have it surveyed according to law, leaving the residue that may result to the nation for other purposes.

"Fourth. If he should fail to comply with these conditions, he shall forfeit his title to the land, and it will be denounceable by another.

"Therefore, I command that this present order be to him the title, and holding it for good and valid, a copy thereof be entered into the proper book, and given to the party interested for his protection and other purposes."

No approval of this grant by the departmental assembly appears of record, but the finding of the commission was that whatever of right passed to Pico was transferred by conveyances to Warner. The second grant, that in 1845, was made directly to Warner, upon his personal application, which application was thus endorsed.

"OFFICE OF THE FIRST JUSTICE OF THE PEACE.

"*San Diego.*

"In view of the petition which the party interested remits to this office, I beg to state that the said 'Valle San José' is, and has for the past two years been vacant and abandoned, without any goods nor cultivation on the part of San Diego; but said place belongs at the present time to the said mission, and at petitioner's request I sign this in San Diego.

"August 6, 1844.                                 JUAN MA MARRON.

" *To the Most R. P. Vincent Olivas:*

" With the object of soliciting in property the place known by the name ' Valle de San José,' formerly occupied by the mission under your charge, I beg of you to be so kind as to inform me if, at the present day, the Mission of San Diego does occupy the said land, and if not, how long since it has been abandoned.

" San Diego, August 5, 1844.       JUAN J. WARNER. ·

" The ' Valley of San José ' can be granted to the party who petitions for it, inasmuch as the Mission of San Diego, to whom it belonged, has no means sufficient to cultivate and occupy it, and it is not so necessary for the mission.

"FR. VINCENT P. OLIVAS.

" Mission of San Diego, August 5, 1884."

The grant was in these words:

" The citizen, Manuel Micheltorena, general of brigade of the Mexican army, adjutant general of the same, governor general, commander and inspector of both Californias:

" Whereas Juan José Warner, Mexican by naturalization, has petitioned for his own personal benefit, and that of his family, the land known by the name ' Valle de San José,' bounded on the east by the entrance into San Felipe and the mountain, on the west by the mountain and canyon of Aguanga; and on the north bounded by the mountain, and the boundaries on the south being the ' Carrizo ' and the mountain; having previously complied with the notices and investigations on such matters as prescribed by the laws and regulations, exercising the powers conferred on me in the name of the Mexican nation, I have resolved to grant him the said land, declaring it by these presents his property, subject to the approbation of the most excellent assembly of the department, and to the conditions following, to wit:

" First. He will not be allowed to sell it, to alienate it, nor to mortgage it, to place it under bond, or to place it under any obligation, nor give it away.

" Second. He will be allowed to fence it in, without interference with the roads, and other usages (servidumbres). He will hold it freely and exclusively, turning it to agriculture, or any

other use he may please, and he shall build a house on it within one year, and live in it.

"Third. He shall apply to the respective judge to give him judicial possession thereof, by virtue of this order, by which he shall mark out the boundaries whereon he shall place the stakes, some fruit and wild trees of some use or other.

"Fourth. The land which is being granted consists of six leagues, more or less (seis sitios de ganado mayor) according to the respective map or plan. The judge who may give possession thereof shall have it surveyed according to law, leaving the residue (sobrante) to the nation for its use.

"Fifth. Should he fail to comply with these conditions, he shall forfeit his right to the land, and it will be denounceable by another. Therefore I order that this present decree be to him his title, and holding it for good and valid notice thereof be entered into the respective books and be given to the interested party for his protection and other purposes."

The grant was subsequently approved by the departmental assembly on May 21, 1845. On the application to the Private Land Commission the matter was investigated, and a report made by Commissioner Felch, in these words :

"*J. J. Warner* v. *The United States,* for the place called Agua Caliente y Valle de San José, in San Diego County, containing six square leagues of land.

"Two grants are presented and proved in this case : The first made by Governor Juan B. Alvarado to José Antonio Pico, on the 8th day of June, 1840 ; the other by Governor Manuel Micheltorena, on the 28th day of November, 1844, to the present claimant. The land embraced in the grant to Pico is designated by the name Agua Caliente, and that described in the grant to Warner is called the Valle de San José. On comparing the descriptions of the two parcels of lands and maps which constitute portions of the two expedientes, it is manifest that the grant to Warner embraces the premises described in the previous grant to Pico. The place known by the name of Agua Caliente constitutes the northern portion of the valley known by the name of San José, while the grant to Warner describes the entire valley, and the witnesses testify that the rancho claimed

by Warner is known by these names, but more frequently it has recently been called Warner's rancho. The testimony shows that Pico had set out some vines on the place before the grant was made to him, and that he built a house on the place after the grant, but in 1842 he left the place, probably on account of the danger from the Indians, and does not appear to have done anything more in connection with it.

"The proof is scarcely sufficient to establish the performance of the conditions of the grant by him, while his absence from the place, and the want of any evidence of an attempt to return to it after 1842, indicates an abandonment of it. It was so treated by Warner in petitioning for a grant of the same in 1844, and by the governor in making the concession to him. If, however, there was any remaining interest in said Pico by virtue of the grant to him, the present claimant has succeeded to that interest by virtue of a conveyance made to him by said Pico on the thirteenth day of January, 1852. This conveyance is given in evidence.

"I think, however, that the right of the present claimant must be determined entirely by the merits of the case based on Micheltorena's grant to him.

"This grant was approved by the departmental assembly May 21, 1845.

"The testimony of Andres Pico shows that Warner was living with his family on the place in the fall of 1844 and cultivating portions of the land.

"His residence on the place appears to have been continued until 1851, when the Indians burnt his buildings and destroyed his stock. Since that time his occupation has been continued by his servants.

"In the grant, the description of the land petitioned for is such as to embrace the entire valley called San José, as laid down on the map constituting a part of the expediente, giving well-defined landmarks and boundaries, which the witnesses testify are well-known objects.

"The valley is very irregular in shape and is surrounded by high hills.

"Juridical measurement was required and the quantity of six

square leagues was granted, but as the measurement was never obtained, it is important to determine whether the grantee is entitled to hold the entire premises described in the grant; using the scale given on the desino referred to in the grant, the quantity included in the premises cannot exceed six square leagues of land.

"The testimony of the witnesses who were interrogated on the subject estimate it variously; some more and some less than the quantity conceded. On an examination of the whole case, however, we are inclined to the opinion that the petitioner should have a confirmation of the premises according to the description contained in the grant to him, and a decree will be entered accordingly."

Upon that report the title was confirmed, which, as heretofore stated, was approved by the District Court, and thereupon a patent was issued.

From these papers the following appears: The grant to Pico was made subject to the condition that he should "not molest the Indians that thereon may be established." No such condition was attached to the subsequent grant to Warner. On the contrary, the report of the justice of the peace was that the land had been for two years vacant and abandoned; that there were some property rights vested, not in the Indians, but in the Mission of San Diego, and the official of that mission consented to the grant, inasmuch as the mission had no means to cultivate and occupy the land, and it was no longer necessary for its purposes.

Some discussion appears in the briefs as to the meaning of the word translated "usages" (servidumbres) which appears in both grants, and it is contended by the plaintiffs in error that it is equivalent to the English word "servitudes," and is broad enough to include every right which any one may have in respect to the premises, subordinate to the fee. We shall not attempt to define the meaning of the word standing by itself. It may be conceded that it was sometimes used to express all kinds of servitudes, including therein a paramount right of occupation, but the context seems to place a narrower meaning upon its use here. Thus, in the first grant not only is there

the distinct provision that the Indians established on the land shall not be molested, but the grantee "is allowed to fence it in without interfering with the roads, cross roads, and other usages" (servidumbres). In the second the grantee is "allowed to fence it in without interference with the roads and other usages" (servidumbres). Obviously, it is in these two clauses contemplated that the fencing is to be without interference with roads and other usages or burdens. It does not mean that the general occupation and control of the property is limited by any so-called servidumbres, but only that such full control shall not be taken as allowing any interference with established roads or cross roads, or other things of like nature.

It thus appears that prior to the cession the Mexican authorities, upon examination, found that the Indians had abandoned the land; that the only adverse claim was vested in the Mission of San Diego, and made an absolute grant, subject only to the condition of satisfying whatever claims the mission might have. How can it be said therefore that when the cession was made by Mexico to the United States there was a present recognition by the Mexican government of the occupancy of these Indians? On the contrary, so far as any official action is disclosed, it was distinctly to the contrary, and carried with it an affirmation that they had abandoned their occupancy, and that whatever of title there was outside of the Mexican nation was in the mission, and an absolute grant was made subject only to the rights of such mission.

For these reasons we are of opinion that there was no error in the rulings of the Supreme Court of California, and its judgments in the two cases are

*Affirmed.*

Mr. Justice White did not hear the argument of these cases or take part in their decision.