The CHITIMACHA TRIBE OF
LOUISIANA et al.

v.

HARRY L. LAWS COMPANY, INC.,
et al.

Civ. A. No. 770772.

United States District Court,
W. D. Louisiana,
Lafayette-Opelousas Division.

April 24, 1980.

Donald Juneau, New Orleans Legal Assistance Corp., New Orleans, La., for Tunica Tribe.

Blanchard, Walker, O'Quin & Roberts, Robert Roberts, III, Shreveport, La., and Butler, Binion, Rice, Cook & Knapp, Andrew Wooley and Louis Paine, Houston, Tex., for P & O Iol Corp.

Fontenot, Andrus & Preis, Vance R. Andrus, Lafayette, La., for Andrea R. Hertel.

Timothy W. Cerniglia, New Orleans, La., for Texaco Inc.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, M. Hampton Carver, New Orleans, La., for Chevron Oil.

Charles D. Marshall, Jr., New Orleans, La., for La. Land and Exploration.

Cooper, Sonnier, Ortego, Hebert & Woodruff, Silas B. Cooper, Jr., Abbeville, La., for Lastarmco, Inc.

Doyle, Smith & Doyle, Roger H. Doyle, New Orleans, La., for Union Oil Co. of California.

Plauche, Hartley, Lapeyre & Ottinger, Patrick S. Ottinger, Lafayette, La., for Eason Oil.

Harry Case Stansbury and John C. Hose, and Guy J. D'Antonio, II, New Orleans, La., Bauer, Darnall, McNulty & Boudreaux, Michael J. McNulty, Jr., and Newman Trowbridge, Jr., Franklin, La., for E. J. Robicheaux, Vincent J. St. Blanc, Jr., Stephanie B. Dinkins, H. H. Dinkins, Jr., Stephanie Dinkins, Gertrude O. Dinkins and Ladd O. Dinkins.

Liskow & Lewis, George H. Robinson, Jr., Lafayette, La., and Liskow & Lewis, Gene W. Lafitte, New Orleans, La., for Atlantic, Edgewater and Amoco.

George Bailey, Lafayette, La., for Cities Service.

J. William Vaudry, Jr., and Moise W. Dennery, McCloskey, Dennery, Page & Hennesy, New Orleans, La., for Adeline Sugar Factory Co., Ltd., Ray A. Dupuy, Ethel Giles Chance, Beverly Marie Dupuy Comeaux, Robert F. Giles and Fabiola May Dupuy Phenis.

William S. Strain, Gordon, Arata, McCollam & Watters, New Orleans, La., for Tenneco Oil Co.

Robert C. Smith, New Orleans, La., for Amoco Production Co.

Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lawrence E. Donohoe and E. Randall Lolley, Lafayette, La., Alex Allain, Jeanerette, La., for Rodney J. Banta and Elizabeth B. McGee Le.

Polack, Rosenberg, Rittenberg & Endom, Franklin V. Endom, Jr., New Orleans, La., for Michane P. Burns.

## RULING ON MOTION

W. EUGENE DAVIS, District Judge.

Plaintiff, the Chitimacha Tribe of Louisiana, (Chitimacha Tribe) claims ownership of a large tract of land in St. Mary Parish, Louisiana. Plaintiffs allege that the lands they claim were part of the Indian Tribe's aboriginal territory and that the deeds by which the tribe sold the lands to defendants' ancestors in title were nullities.

*UNCONTESTED FACTS*

No material issue of fact is raised as to the following:

1) The Chitimacha Tribe purported to transfer to defendants' ancestors in title the land involved in this litigation as follows:

a) To Phillip Verret by deed dated September 10, 1794.

b) To Frederick Pellerin by deed dated October 2, 1794.

c) To Marie Joseph by deed dated June 22, 1799.

(Defendants' three ancestors in title may sometimes be referred to as "Verret et al.")

2) Following the Louisiana Purchase in 1803, Verret et al. sought United States recognition of their title by making claim to the land according to procedures set forth in acts of congress (Louisiana Land Claims Acts). Favorable reports were made on these claims by the commission authorized by Congress to adjudicate the claims, and the claims of Verret et al. were confirmed by the Congress in 1816.

## ISSUE PRESENTED

Plaintiffs contend, for various reasons, that the transfers executed by the tribe in favor of Verret et al. were a nullity. Plaintiffs' primary claim is that the transfers violated the terms of the Indian Nonintercourse Act which provided:

> That no sale of land made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Act of July 22, 1790, 1 Stat. 317.

Among the defenses raised by the motions for summary judgment are: 1) Prior to the United States' sovereignty over Louisiana, all of the lands involved in this suit were validly transferred pursuant to Spanish law to Verret et al., and consequently

the Indian Nonintercourse Act, a statute of the United States, has no application to those transfers; 2) after its acquisition of Louisiana, the United States approved and confirmed each of the titles acquired by Verret et al. and even if the Indian Nonintercourse Act is deemed applicable, it cannot have the effect of invalidating defendants' title. More particularly, defendants urge that under the Louisiana Land Claims Acts the Congress established the exclusive procedure for claiming title to land within the Louisiana Purchase and precluded all other claims, including plaintiffs' claims asserted in this action.

## DISCUSSION

█ I conclude that plaintiffs' title to the land claimed in this suit has been extinguished and plaintiffs are barred from asserting these claims under the preclusive provisions of the Louisiana Land Claims Acts. On this basis alone, the defendants' motions for summary judgment are granted, making it unnecessary to consider any other basis for the motions urged on us by defendants.

Because of the changes of sovereignty between France and Spain prior to 1803, the different land acquisition policies of those two nations and the incomplete state of the French and Spanish land records, considerable confusion reigned with respect to land ownership at the inception of United States sovereignty over this territory. *See* Coles, *The Confirmation of Foreign Land Titles in Louisiana*, 38 La. Historical Quarterly 1 (1955). As a consequence, the Congress enacted the Louisiana Land Claims Acts.[1]

These acts generally required all private claimants to register a notice of their claim with the Register of the Land Office and provided for a board of land commissioners to review, analyze and report upon the

---

1. Act of March 2, 1805, 2 Stat. 324; Act of March 21, 1806, 2 Stat. 391; Act of March 3, 1807, 2 Stat. 440; Act of March 10, 1812, 2 Stat. 692; Act of April 14, 1812, 2 Stat. 709; Act of February 27, 1813, 2 Stat. 807; Act of April 18, 1814, 3 Stat. 139; Act of April 29, 1816, 3 Stat. 328; Act of May 11, 1820, 3 Stat. 573; Act of May 16, 1826, 4 Stat. 168; Act of May 26, 1824, 4 Stat. 52 (extended to Louisiana by Act of June 17, 1844, 5 Stat. 676). Hereinafter these enactments will be referred to individually by the year of their passage and collectively as the Louisiana Land Claims Acts or Louisiana Acts.

claims filed. The 1807 Act (which amended and supplemented the 1805 and 1806 Acts) expanded the functions and powers of the land commissioners by providing "that the commissioners . . . shall have full powers to decide according to the laws and established usages and customs of the French and Spanish Governments, upon all claims to lands within their respective districts, . . . which decision of the commissioners when in favour of the claimant shall be final, against the United States, any act of Congress to the contrary notwithstanding."

Beginning with the 1805 Act, Congress also established a time limitation for filing notice of claims:

> And if such person shall neglect to deliver such notice in writing of his claim, together with a plat as aforesaid, or cause to be recorded such written evidence of the same, all his right, so far as the same is derived from the two first sections of this act, shall become void, and forever thereafter be barred; . . . .

The 1807 Act extended the time for filing notice of claims, but also contained peremptive language:

> [B]ut the rights of such persons as shall neglect so doing [filing notice of claim] within the time limited by this act, shall, so far as they are derived from or founded on any act of Congress, ever after be barred and become void, and the evidences of their claims never after admitted as evidence in any court of law or equity whatever.

Subsequent enactments extended the time for filing notices, but in each instance Congress provided (often in identical terms) that untimely claims would be void and any evidence of them deemed inadmissible in courts of the United States.[2]

---

**2.** *See* Act of March 10, 1812, 2 Stat. 692 § 1; Act of April 14, 1812, 2 Stat. 709, § 1; Act of February 27, 1813, 2 Stat. 807, § 1; Act of May 11, 1820, 3 Stat. 573, §§ 2, 4; Act of May 26, 1824, 4 Stat. 52 §§ 5, 7 (extended to Louisiana by Act of June 17, 1844, 5 Stat. 676).

**3.** Act of March 3, 1851, 9 Statutes at L. 631, Chap. 41, § 13 provides:

In *Barker v. Harvey*, 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901), the Supreme Court was called on to interpret a similar provision of the California Private Land Claims Act.[3] Plaintiffs sued to quiet title to land held under a patent confirming grants made by the Mexican government to the plaintiffs' ancestor in title. The defendants, Mission Indians, contended that plaintiffs' title was subject to their right of permanent occupancy which they claimed had been recognized by the government of Mexico long before the existence of the grants relied on by the plaintiffs. The Court had no difficulty in concluding that the Indian claims were abandoned when they were not presented to the commission for consideration within the time allowed by the act.

A similar result was reached in *United States v. Title Insurance & Trust Co.*, 265 U.S. 472, 44 S.Ct. 621, 68 L.Ed. 1110 (1924). In that case, the United States brought suit on behalf of the Mission Indians to confirm in them a perpetual right of occupancy, use and enjoyment in certain property held by the defendants under a government patent which confirmed a Mexican land grant. The Court followed *Barker's* interpretation of the California Act and held that the Indians' claim was barred because it had not been presented to the commission and that full title, unencumbered by any rights of the Indians, had passed to the defendants.

The plaintiffs seek to distinguish these decisions on two grounds. First, they contend that the statutes in question bear more similarity to those interpreted in *United States v. Santa Fe Pacific Railroad Co.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941) than to the California Act. Their second

That all lands, the claims to which have finally been rejected by the commissioners in the manner herein provided, or which shall be finally decided to be invalid by the District or Supreme Court, and all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States . . . . .

argument is that the absence of a specific provision extinguishing Indian claims in the acts covering Louisiana prevents the loss of their rights by peremption.

In *Santa Fe*, suit was brought by the United States on behalf of the Walapai tribe to enjoin the defendant railroad from interfering with the tribe's possession and enjoyment of property in Northwest Arizona. The government contended that its grant of the property to the railroad was subject to the Indians' right of occupancy. The railroad argued that all Indian rights had been extinguished by the operation of certain enactments [4] which authorized the Surveyors General of the New Mexico Territory and the Arizona Territory to ascertain the origin, nature, extent and character of land claims under Spanish or Mexican authority. In holding that these statutes did not extinguish the Indian claims, the Court contrasted the statutes under review with the California Private Land Claims Act.

> The acts of 1854 and 1870, unlike the Act of 1851, merely call for a report to Congress on certain land claims. If there was an extinguishment of the rights of the Walapais, it resulted not from action of the Surveyor General but from action of Congress based on his reports.

314 U.S. 339, 351, 62 S.Ct. 248, 253, 86 L.Ed. 260, 272.

It is clear from a reading of the statutes and the decisions interpreting them that the Louisiana Land Claims Acts bear more similarity to the California Private Land Claims Act than to the acts reviewed in *Santa Fe*. The Louisiana and California Acts establish systems for filing, deciding and confirming land claims; both acts require claims to be asserted within a designated period or be forever barred. In contrast, the New Mexico and Arizona Acts merely require a report to Congress on the status of land claims in the territories.

The plaintiffs also contend that Indian claims cannot be extinguished in the absence of a specific, express reference to such claims and that the Louisiana Land Claims Acts were not intended to affect Indian land. In support of this position, the plaintiffs interpret the decision in *Barker* to be predicated on a reference to Indian claims in § 16 of the California Act.[5]

Plaintiffs' interpretation of *Barker* is specious. Although the Court mentioned § 16 in passing, the decision is based entirely on the provision requiring timely filing of claim notices.

The Court, in *Santa Fe*, distinguished *Barker* solely on the basis of the extinguishment of claims provision in the California Act. No reference was made to § 16 of the California Act. For these reasons, it seems clear that the Court's decision in *Barker* is not predicated on the specific reference to Indian claims found in § 16 of the California Private Land Claims Act.

Moreover, scrutiny of the statutory language reveals congressional intent for the Louisiana Land Claims Acts to extend to Indian claims. Under § 4 of the Act of March 2, 1805, the seminal enactment, "every person claiming land in the above-mentioned territories" was required to file a notice of any claim he wished to assert; no exception was made for any group of landholders. In addition, § 1 of the same act provides for confirmation of certain claims "for lands lying within the said territories to which the Indian title had been extinguished", an indication that the commissioners were authorized to determine questions concerning the validity of Indian

---

**4.** Act of July 22, 1854, 10 Stat. at L. 308, Chap. 103, § 8; Act of July 15, 1870, 16 Stat. at L. 291, 304, Chap. 292. A third statute, Act of March 3, 1865, 13 Stat. at L. 541, 559, Chap. 127, proposed to create a reservation for the Walapai tribe; it is clearly inapplicable to the instant case.

**5.** Section 16 of the California Act provides:

That it shall be the duty of the commissioners herein provided for to ascertain and report to the Secretary of the Interior the tenure by which the mission lands are held, and those held by civilized Indians, and those who are engaged in agriculture or labor of any kind, and also those which are occupied and cultivated by Pueblos or Rancheros Indians.

claims. The Opelousas Claims Reports clearly reflect this general practice by the Louisiana Commissioners.[6]

Congress' express approval and adoption of the Opelousas Claims Reports by the Act of April 29, 1816, 3 Stat. 328, belies the plaintiff's contention that the title confirmation acts were not intended to apply to Indian lands.

Further support for the position that the acts applied to Indian lands is found in *United States v. Arredondo*, 6 Pet. 691, 8 L.Ed. 547 (1832). In that case, the plaintiff brought suit to confirm his claim to Florida property held under a Spanish grant. The United States took the position that the land involved was in Indian territory and therefore not subject to the grant. The Court noted that Spanish authorities in Florida had conducted a sort of inquest and had determined that the Indians had abandoned the lands in question. In discussing its reasons for giving *res judicata* effect to this decision, the Court noted the similarity of the Spanish proceeding to those established in various title confirmation acts. In passing, the Court seemed to indicate that Indian claims were embraced by the Act of May 11, 1820, a title confirmation statute applicable in both Florida and Louisiana which made no specific reference to Indian claims:

> Similar proceedings are directed by the various acts of Congress; the land-commissioners, or officers of the land offices, as the case may be, confirm or reject claims, and the land embraced in the rejected claims reverts to the public fund. So it is provided by the seventh section of the Act of 1824, as to claims barred by not being duly presented or prosecuted, or which shall be decreed against finally by this court. There is another answer to

---

6. In the conclusion to their report of April 6, 1815, the commissioners summarized the principles applied in evaluating claims based on purchases from Indians:

> The undersigned commissioners are of opinion that there is a wide difference between the titles of such persons as have purchased lands from Indians, which such Indians were actually occupying at the date of their sales, and the titles and claims of persons who purchased from Indians not in the actual occupancy of the land at the date of their sales. Purchasers of the first description, although the deeds of transfer may not have been presented, and of course could not have received the governmental sanction, may be considered as having extinguished the kind of title which the Indians enjoy, and are, therefore, in the opinion of the commissioners, equitably entitled to so much at least of the land claimed as would be a full indemnity for the consideration they may have paid for it. Purchasers of the second description would not, in the opinion of the Board, be entitled to any remuneration, because it is conceived the Indians, in such cases, were selling a thing to which they had no kind of title.
>
> The investigation of claims for lands purchased from Indians seems to have brought into view four distinct classes. First. Claims for lands purchased from Indians denominated Christians, whose sales are generally for small tracts of such extent as an Indian and his family might be supposed capable of cultivating: passed before the proper Spanish officer, and duly filed of record. These sales are believed to have been valid by the usages of the Spanish Government without ratification being necessary. Secondly. Claims for lands purchased from some tribe, or chief of some tribe of Indians, the sales of which may have been ratified by the Governor of the province. These are also considered as valid; the Indian sale transferring their right; the ratification of the Governor being regarded as a relinquishment in favor of the purchaser of the right of the crown. Thirdly. Claims for land purchased from Indians of the description last mentioned, who, from the evidence adduced before the Board, shall appear to have been in the actual occupancy of the land at the date of their sales, but whose deeds of sale may not have been presented for the ratification of the Governor. In this case, the Indians are considered as having transferred only the right of occupancy which they held at the will of the Government. The title is incomplete, but the purchaser supposed to have an equitable claim for the confirmation of his title *to so much of the land claimed*, as would be a full indemnity for the consideration he may have paid. Fourth, and lastly. Claims for lands sold by Indians of the last description, who did not occupy them at the date of their sales, and whose sales have not been ratified by any Governor of Louisiana. Such sales are considered as vesting no title in the purchasers; and the claims such (unless accompanied by some equitable circumstance in their favor) as, in the opinion of the Board of Commissioners, ought not to be confirmed.

this objection, which deserves notice: grants of land within the Indian boundary are not excepted in the laws referring them to judicial decision; Congress made what exceptions they thought proper; as the law has not done it, we do not feel authorized to make an exception of this.[7]

6 Pet. 691, 748, 8 L.Ed. 547, 568.

The plaintiffs' argument for the inapplicability of the Louisiana Land Claims Acts to Indian land is therefore unpersuasive. In *Barker v. Harvey*, the Supreme Court interpreted less forceful language to effect an extinguishment of Indian claims which were not presented to the claim commissioners. The plaintiffs' position that the statutes construed in *Santa Fe* provide a better guide than the California Act is unsupportable—the similarities of the Louisiana and California Acts are unmistakable, their differences with the Arizona and New Mexico Acts palpable.

The plaintiffs' corollary position, that Congressional intent to extinguish Indian title must be express and that the Louisiana Acts lack a specific reference to Indian claims, is equally untenable. As noted above, the statutory language and local practice, which was later approved by Congress, both indicate that Congress intended to vest the commissioners with authority under the Louisiana Land Claims Acts to decide questions concerning Indian titles.

The defendants' motions for summary judgment are granted.

This disposition of the case makes it unnecessary to consider the additional issues presented by the motions of plaintiffs and defendants.

---

**7.** *See also Plamondon ex rel. Cowlitz Tribe v. United States*, 467 F.2d 935, 199 Ct.Cl. 523 (1972).