2007 UT 46

**Nan ELDER, individually, and as personal representative of The Estate of Shelly Elder, and on behalf of Amy Elder, Jeremy Elder, Chelsey Elder, and Ryan Elder, minor children, Plaintiff and Appellant,**

v.

**NEPHI CITY, by and through Mayor Chad BROUGH, City Councilmen Mike Jones, Darren Peterson, Richard Paxman, Brent Bowles, and Jim Wilkey, Union Pacific Railroad Company, and John Does I–X, Defendants and Appellees.**

Nos. 20050510, 20050576, 20050581.

Supreme Court of Utah.

June 12, 2007.

Allen K. Young, Provo, Jonah Orlofsky, Chicago, Illinois, for plaintiffs.

Benson L. Hathaway, Stephen W. Geary, Salt Lake City, for defendant Nephi City.

Jeffrey Devashrayee, Casey K. McGarvey, Salt Lake City, for defendant Union Pacific Railroad.

NEHRING, Justice:

## BACKGROUND

¶ 1 Mr. Shelley Elder was killed on a Union Pacific Railroad railway track in Nephi City, Utah, when the dump truck he was driving was struck by a ninety-one-car freight train. Mr. Elder's widow, Mrs. Nan Elder, contends that her husband's death was caused by the negligence of the Railroad and Nephi. According to Mrs. Elder, her husband would not have lost his life had a line of trees located parallel to the railroad tracks not obscured his vision of the train. The trees were situated on land owned by Nephi. Nephi did not operate the train. The Railroad owned the tracks and operated the train, but had no recorded property interest in the ground where the trees were located.

¶ 2 The district court summarily dismissed Mrs. Elder's wrongful death claim. It ruled that as a matter of law neither Nephi nor the Railroad owed a duty to Mr. Elder to assure that the trees did not impair motorists' ability to observe approaching trains. We decline Mrs. Elder's invitation to impose upon the Railroad a property interest and agree with the district court's conclusion that the Railroad was under no duty to remove the trees. We furthermore agree with the district court's determination that Nephi owed no statutory duty, but conclude the court erred when it held Nephi owed no common-law duty to Mr. Elder.

## ANALYSIS

▮ ¶ 3 As Mrs. Elder acknowledges, this appeal turns solely on whether either Nephi, the Railroad, or both owed Mr. Elder a duty to attend to the row of trees beginning some 170 feet south of a road crossing in Nephi and extending approximately 30 feet along the west side of the Railroad's tracks. The question of whether a duty exists is one of law, which we will review for correctness. *Salt Lake County v. W. Dairymen Coop., Inc.*, 2002 UT 39, ¶ 16, 48 P.3d 910 (citing

1. Utah Code Ann. § 41–6–19 (1998).

2. The federal government, for example, assumed primary responsibility for promulgating safety

*Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986)).

¶ 4 The fate of the duty allegedly owed to Mr. Elder turns on the answers to two questions: Did either Nephi or the Railroad have the legal authority to exercise control over the trees? Assuming that either defendant had a right to control the trees, was that defendant's relationship to the operation of the railroad or the motoring public of such a quality as to require it to be aware of the potential hazards posed by the trees obstructing the vision of motorists at the railway crossing?

¶ 5 The answer to each question is found in the facts. The presence or absence of the right to control the trees can be traced to two sources: the nature of the interest, if any, Nephi or the Railroad had in the land occupied by the trees; or a statute or regulation conferring such a right. The district court ruled that the record contained no disputed material facts sufficient to support a claim that the Railroad had an interest in the land occupied by the trees. The district court also summarily ruled that although Nephi held the fee interest to the land bearing the trees, actual control over the trees was vested in the Nephi Irrigation Company, notably not a party to this litigation, which held an easement over Nephi's property to operate an irrigation canal. Finally, the district court turned away Mrs. Elder's contention that Utah law requiring property owners to remove vegetation that creates a traffic hazard[1] imposed a duty on Nephi. We will explore each of Mrs. Elder's claims of duty in turn.

I. THE DISTRICT COURT PROPERLY DETERMINED THAT THE RAILROAD HAD NO CONTROL OVER THE TREES AND THEREFORE OWED NO DUTY TO MR. ELDER

▮ ¶ 6 In this quest to affix a duty to the Railroad, Mrs. Elder looks solely to sources related to property interests and not to statute.[2] The Railroad owns a right-of-way over

regulations at railroad grade crossings under the provisions of the Federal Railroad Safety Act of 1970, Pub.L. No. 91–458, 84 Stat. 971. In its

land located at what would, if it existed, be the site of 300 West Street in Nephi. In Utah's unique system of street designation—confounding to the uninitiated but a handy tool in the hands of those conversant with its nomenclature—a street bearing an "east" or "west" name runs north and south. Mr. Elder's truck was struck by a northbound freight train that was passing over tracks placed on the Railroad's right-of-way over the 300 West corridor.

¶ 7 Oddly, the Railroad concedes that no recorded evidence exists to indicate it owns its claimed right-of-way through Nephi. Rather, the Railroad contends it acquired its right to maintain tracks and operate trains through Nephi through a prescriptive easement. That a railway company would rely on the operation of law to acquire a legal right to land over which it places its rails would appear to be a risky and unusual course of action. It would also seem unnecessary in light of our nation's historical practice of making generous grants of property interests to railroad companies to induce them to tame the western frontier with the steel conduit of civilization. *See Moon v. Salt Lake County,* 27 Utah 435, 76 P. 222, 225 (1904) (describing railroad grants as measures designed to "induce capital to engage in the building of such roads over the public domain, and thereby reclaim and render inhabitable and productive a section of country hitherto almost valueless—little more than a barren waste"). The first and most significant congressional measure granting public land to railway companies bore a title that spoke directly to the ambitions of a nation committed to the cause of Manifest Destiny: "An Act to aid in the Construction of a Railroad and Telegraph Line from the Missouri River to the Pacific Ocean, and to secure to the Government the Use of the same for Postal, Military, and Other Purposes." Pacific Railroad Act, ch. 120, 12 Stat. 489, 489 (1862).

¶ 8 In 1875 Congress enacted supplemental legislation that granted to railroad companies a "right of way through the public lands of the United States." Railroad Right of Way Acts, ch. 152, 18 Stat. 482, 482 (1875). Mrs. Elder contends that the Railroad acquired its right-of-way pursuant to this statute.[3] If the Railroad did, its right-of-way, presumably accompanied by the right to exercise control over it, would reach land up to 100 feet west of its central line as authorized by Congress. This land would encompass the offending trees. We conclude, however, that the ground over which the Railroad's tracks pass within the boundaries of Nephi was, at the time the tracks were laid, no longer public land and thus not subject to transfer from the United States to the Railroad's predecessor under the 1875 Act.

¶ 9 Three years before right-of-way acquisition became possible under the 1875 Act, the United States conveyed by patent the land now occupied by Nephi. The original patent did not name Nephi as the grantee, but rather was issued to "Jacob G. Bigler, County Judge of Juab County, Utah Territory, in Trust for the Several use and benefits of the inhabitants of the Townsite of Nephi."

¶ 10 Congress authorized this patent through the Federal Townsite Act of 1867, ch. 177, 14 Stat. 541, which reflected a congressional desire to encourage settlement of frontier lands by providing a means to guarantee legal title to settlers who chose to occupy lands that had become or were destined to become townsites. The 1867 Act delegated to county probate judges, like Judge Bigler, in unincorporated towns, like Nephi, responsibility to hold the land subject

---

form in effect at the time of the accident, the Act delegated to the United States Secretary of Transportation the authority to implement regulations establishing effective national grade safety standards. 49 U.S.C.S. § 20103 (1998).

**3.** The dimensions of the property right created by these rights-of-way have spawned considerable litigation. *See Great N. Ry. Co. v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *W. Union Tel. Co. v. Pa. R.R. Co.,* 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904); *N. Pac. Ry.*

*Co. v. Townsend,* 190 U.S. 267, 23 S.Ct. 671, 47 L.Ed. 1044 (1903); *New Mexico v. U.S. Trust Co.,* 172 U.S. 171, 19 S.Ct. 128, 43 L.Ed. 407 (1898); *Wyoming v. Udall,* 379 F.2d 635 (10th Cir.1967); *Idaho v. Or. Short Line R.R. Co.,* 617 F.Supp. 207, 212 (D.Idaho 1985). The outcomes of these cases—that a railroad right-of-way is a creature that occupies a unique place among property interests somewhere between traditional easements and fee interests—do not concern us here.

to the federal patent in trust and to distribute it according to rules and regulations prescribed by the state or territory. *Id.* at 541. Utah law required probate judges to oversee the distribution of lands consistent with the aims of the Federal Townsite Act and adjudicate controversies between vying land claimants. *See Stringfellow v. Cain,* 99 U.S. 610, 612, 25 L.Ed. 421 (1879); William Wirt Blume & Elizabeth Gasper Brown, *Territorial Courts and Law,* 39 Mich. L.Rev. 39, 63 (1962) ("Organization of these [probate] courts was left to the territorial governments with freedom to provide local election or appointment of the judges.").

¶ 11 With the issuance of the patent to Judge Bigler, the land within the city limits of Nephi, including the railway crossing where Mr. Elder was killed, left the inventory of public lands held by the United States. We conclude, therefore, that when the United States issued its patent to Judge Bigler, it surrendered its ability to convey a railroad right-of-way over the same land pursuant to the 1875 Act. The original section of tracks occupying the 300 West corridor through Nephi were laid in 1879. That the United States and the Railroad's predecessor believed the land where the tracks were to be laid was not subject to the 1875 Act finds support in the absence of two sources: any documented evidence of a congressional grant of a right-of-way or any other formal conveyance of a property interest in the 300 West corridor to provide legal authority for laying the tracks. Thus the Railroad's claim that it acquired its right to lay tracks and operate trains through Nephi by prescription—one that has not been challenged by Nephi, the fee owner of the property—appears to us to be the only plausible theory under which the Railroad can establish a legal claim to the use of the land underlying the tracks.

¶ 12 As noted above, it is not lost on us that it was hardly prudent for the Railroad's predecessor to fail to formalize in some form the acquisition of its right-of-way through Nephi, especially given its right to acquire rights-of-way over private land by condemnation. Mrs. Elder seizes on this seemingly inexplicable oversight by contending that the

land did not lose its character as public when the United States conveyed it to Judge Bigler. According to her interpretation, the land became private only when it was conveyed from Judge Bigler to the early residents of Nephi. While this does not explain why no evidence survives reflecting a grant of a right-of-way along the 300 West corridor, Mrs. Elder holds this interpretation out as a more likely explanation than a scenario featuring the Railroad's forgetfulness in perfecting an interest in the land over which it intended to lay tracks and operate trains.

¶ 13 We believe that the pivotal analytical consideration in ascertaining the character of lands as public is a practical one: whether the United States retained the authority to grant a right-of-way over the land. By arguing that the land must be treated as public because it was not held in the names of parties who were demonstrably private Mrs. Elder avoids confronting the fundamental issue of whether the United States could have provided the Railroad with a right-of-way through Nephi had the Railroad sought one.

¶ 14 The United States Supreme Court has characterized as "well settled" the definition of public lands as lands " 'subject to sale or other disposal under general laws.' " *Union Pac. R.R. Co. v. Harris,* 215 U.S. 386, 388, 30 S.Ct. 138, 54 L.Ed. 246 (1910) (quoting *Newhall v. Sanger,* 92 U.S. 761, 763, 23 L.Ed. 769 (1876)); *see also Nelson v. N. Pac. R.R. Co.,* 188 U.S. 108, 129–34, 23 S.Ct. 302, 47 L.Ed. 406 (1903); *Minnesota v. Hitchcock,* 185 U.S. 373, 391, 22 S.Ct. 650, 46 L.Ed. 954 (1902); *Barker v. Harvey,* 181 U.S. 481, 490, 21 S.Ct. 690, 45 L.Ed. 963 (1901); *Whitney v. Taylor,* 158 U.S. 85, 90–93, 15 S.Ct. 796, 39 L.Ed. 906 (1895); *Bardon v. N. Pac. R.R. Co.,* 145 U.S. 535, 540, 12 S.Ct. 856, 36 L.Ed. 806 (1892). By conveying to Judge Bigler the patent to public lands within the borders of Nephi, the United States placed the disposition of those lands beyond its power to sell or dispose of under general laws.

¶ 15 Mrs. Elder insists that the conveyance to Judge Bigler was conditional and carried with it a reversionary interest in the United States that would be triggered if, for example, Nephi never came into being as a city. As we have previously explained, the Federal

Townsite Act authorizing the grant to Judge Bigler contains no mechanism to accomplish a return of the patented lands to the United States nor suggests an intention to have made the patent conditional. Even if we were to read such a reversionary interest into the statute, the United States was clearly foreclosed from selling or disposing of the property subject to the patent under general laws and the property therefore did not satisfy the definition of public lands.

¶ 16 The Railroad contends that it has acquired a prescriptive easement over at least that portion of the 300 West corridor occupied by its tracks. Mrs. Elder accepts this claim, but asserts that if the Railroad's property interest were obtained through prescription, then the dimensions of the easement and the duties attached to it would extend to lands encompassing the trees. As a plaintiff in a wrongful death action striving to establish that the Railroad owed Mr. Elder a duty to remove the trees, Mrs. Elder has of necessity become a champion for the Railroad's property rights. Her quest presents us with the perplexing question of whether and to what extent a plaintiff may in the course of prosecuting a tort claim seek to impose upon an unwilling defendant a property interest based on principles of prescription or adverse possession.

¶ 17 From a plaintiff's point of view, establishing a property interest in the defendant may be critical to making out a case that the plaintiff was owed a duty. That is particularly true here. It is important to recall that the *only* duty Mrs. Elder seeks to impose on the Railroad is the duty to remove the trees. She does not contend that the Railroad owed Mr. Elder a duty to reduce the risk at the crossing where he was killed by taking any other measures. By limiting the scope of her claim against the Railroad in this way, Mrs. Elder has inflated the importance of establishing some basis upon which she could persuasively demonstrate that the Railroad owned or controlled the land where the trees were situated. She has chosen such a course because a court would be unlikely to impose a duty upon a party who has no authority to dictate the fate of a hazard like the trees. *See Simpson v. Gibson,* 164 Ill.App. 147, 149–50 (Ill.App.Ct.1911) (finding the city liable for removing trees obstructing a roadway when the plaintiff and the city were co-owners of trees as "trees growing upon a boundary line are the joint property of the adjoining owners and for their destruction an action of trespass will lie").

¶ 18 No party has directed us to, nor have we been able through our own efforts to discover, any case in which a plaintiff has successfully imposed an unwanted prescriptive property interest on a defendant for the purpose of creating a duty. Mrs. Elder and the Railroad have cited to us a more than ample collection of prescriptive easement cases. Common to them all is the identity of the parties and the nature of the dispute: a contest between competing claimants to real property.

¶ 19 As a general proposition, we are wary of permitting a party having no claim to an interest in land to command rulings affecting another's title solely to establish the existence of a legal duty in a tort action. *See Andrus v. Bagley,* 775 P.2d 934, 935 (Utah 1989) (holding that because plaintiff "had no interest, he had no standing to bring the action" to quiet title in a nontort action). Of particular concern to us is Mrs. Elder's endeavor undertaken here to impose an easement on the Railroad by prescription. A person who has met all of the requirements for obtaining an interest in land by operation of law through prescription or adverse possession may nevertheless decline to perfect his claim. We have acknowledged as much in our description of a prescriptive easement as an interest in land "created when the party claiming the prescriptive easement can prove that 'use of another's land was open, continuous, and adverse under a claim of right for a period of 20 years.'" *Nyman v. Anchor Dev., L.L.C.,* 2003 UT 27, ¶ 18, 73 P.3d 357 (quoting *Orton v. Carter,* 970 P.2d 1254, 1258 (Utah 1998)).

¶ 20 Standing to bring a quiet title action to perfect title is limited to parties who could acquire an interest in the property created by the court's judgment or decree. *See Andrus,* 775 P.2d at 935; *Pender v. Bird,* 119 Utah 91, 224 P.2d 1057, 1060 (1950); *Besnilian v. Wilkinson,* 117 Nev. 519, 25

P.3d 187, 189 (2001); *Bowles v. Pro Indiviso, Inc.,* 132 Idaho 371, 973 P.2d 142, 146 (1999). Because we see no reason why these well-established standing requirements should not extend to claims by prescriptive easement, we decline to extend our rules to permit a party to create a property interest in a third party for the purpose of exposing that party to liability for damages. Although a circumstance may arise in which we might find appropriate the creation of a prescriptive right by proxy, we do not face that circumstance here.

¶ 21 The reach of this holding does not extend to bar all contests where a duty is alleged to flow from the ownership or control of land and the purported tortfeasor disclaims the requisite ownership or control to establish a duty. Although a challenge to ownership or control where the disputed property interest is founded on a written instrument may have the hallmarks of a collateral quiet title action, important distinctions between these contests and those involving prescriptive easement or adverse possession are evident to us and lead us to express no opinion concerning the identity of persons eligible to assert standing.

II. THE PRESENCE OF MATERIAL FACTS RELATING TO NEPHI'S CONTROL OVER THE SITE OF THE TREES BARS SUMMARY JUDGMENT ON THE ISSUE OF WHETHER IT OWED A DUTY TO MR. ELDER

### A. Nephi's Common–Law Duty

■ ¶ 22 Municipalities owe a duty of reasonable care to ordinary people, and this duty extends to travelers upon their highways. This court affirmed the existence of this common-law duty early in Utah's statehood when we stated: "[I]t was the primary duty of the city to exercise reasonable care to maintain the streets in a reasonably safe condition and to guard against injury to persons and property by removing or making reasonably safe any dangerous objects in the streets. This duty was constant, continuing, and nondelegable." *Morris v. Salt Lake City,* 35 Utah 474, 101 P. 373, 377 (1909).

■ ¶ 23 The scope of a governmental entity's common-law duty to persons utilizing roadways under its control extends beyond the boundaries of the thoroughfare. *See Ingram v. Salt Lake City,* 733 P.2d 126, 127 (Utah 1987) ("Streets from side to side, including the sidewalks and all area between, are primarily for public use."). The *Morris* case itself confirms this, as it concerned the duty to safeguard a home from trees located adjacent to a street whose roots had been cut in the course of installing a sidewalk. 101 P. at 377.

■ ¶ 24 A governmental entity does not undertake a duty to remove vegetation from private land that may obstruct the vision of motorists utilizing its roadways. Nor does a private party bear a common-law duty to keep roadways free of visual obstructions caused by vegetation growing on his land. Our court of appeals correctly noted these principles of law in *Jones v. Bountiful City Corp.,* 834 P.2d 556, 560 (Utah Ct.App.1992), *cited with approval in* 19 Eugene McQuillan, *The Law of Municipal Corporations* § 54:112, at 373 (3d ed.2004). The common-law duty of a governmental entity to safeguard those who travel its roads may, however, extend to visual hazards located on its land outside the bounds of the roadway itself. *See Town of Belleair v. Taylor,* 425 So.2d 669, 670–71 (Fla.Dist.Ct.App.1983). In view of this legal principle, the question of ownership and control of the land occupied by the trees elbows aside virtually every other common-law analytical consideration. We turn, then, to assess Nephi's ownership and control of the trees and the relationship of its ownership and control to a duty owed Mr. Elder.

¶ 25 The district court ruled as a matter of law that Nephi did not, despite its ownership of the stand of trees, control them to the degree that its fee interest gave rise to a duty. Nephi's ownership interest and right to control were, in the district court's view, eclipsed by that of the irrigation company that owned an easement along the 300 West corridor where it maintained an irrigation ditch. It is undisputed that the trees sprouted from the embankment of the ditch.

¶ 26 The record before the district court contains little in the way of useful information from which one can gauge the scope of rights enjoyed by the irrigation company by reason of its easement. The flaw in the district court's ruling is its apparent discounting of the importance of this information. A fair reading of the district court's ruling, and of Nephi's arguments to this court, leaves us convinced that the fact of the irrigation company's easement and not its scope accounted for the district court's conclusion that Nephi owed no duty to remove visual obstructions at the crossing where Mr. Elder lost his life.

¶ 27 Not every easement relieves the holder of the servient estate from duties associated with land ownership and control. When a court must identify the locus of that ownership and control for the purpose of assigning duty, it will not do to apply a categorical rule that duty attaches to the owner of the easement and does not adhere to the fee owner. Rather, the scope of an easement holder's duty is dependent on the nature and scope of the permitted use granted by the easement. These duties may, as in the case of irrigation easements, be further defined by statute. *See* Utah Code Ann. § 73-1-8 (1998).

¶ 28 In the motion for summary judgment setting, a fee holder makes no legal headway by establishing the uncontested fact that another party owned an easement over the fee holder's land. Such a fact, standing alone, does nothing to shift the fee holder's tort duties to the easement holder. Thus, in this case, Nephi had to do more than merely show that the irrigation company may have retained an easement over the canal and adjacent trees in order to require Mrs. Elder to present any fact evidence that the scope of the irrigation company's easement did not include a duty to attend to the trees. The burden remained squarely on Nephi to advance factual support for the proposition that responsibility for the trees accompanied the irrigation company's easement.

¶ 29 Here, the record before us is largely barren of facts from which a court could conclude that the irrigation company had taken on whatever duties befell Nephi as the fee owner of the tree site. The presence or absence of a line of trees may be of interest to an irrigation canal operator, but it may not. It would certainly be reasonable for a canal operator to ignore a stand of trees that poses no threat to the normal flow of water in the canal. The allocation of rights and duties to the land occupied by the stand of trees is fact-dependent and those facts are simply not before us, nor were they before the district court. We therefore vacate the district court's grant of summary judgment in favor of Nephi on the issue of common-law duty.

### B. Nephi's Statutory Duty

¶ 30 Utah law requires owners of real property to remove vegetation "which, by obstructing the view of any operator, constitutes a traffic hazard." Utah Code Ann. § 41-6-19 (1998).[4] Mrs. Elder contends that, as the owner of the property where the line of trees was located, Nephi was subject to this obligation. The district court ruled that as a matter of law the statute did not contribute to the creation of a legal duty in Nephi to remove the trees. We agree.

¶ 31 Our court of appeals conducted a comprehensive review of section 41-6-19's application in *Jones v. Bountiful City Corp.,* 834 P.2d 556 (Utah Ct.App.1992).[5] That case concerned a collision between a motorcycle and an automobile at an intersection. According to the injured motorcyclist, rose bushes growing on private property impaired the ability to see oncoming traffic as he approached the intersection. He contended that Bountiful owed him a statutory duty to remove the rose bushes. The court of ap-

---

4. The Utah Legislature has changed this statute since the time of Mr. Elder's accident. The current version found at Utah Code section 41-6a-216 features apparently inappreciable differences in language. We do not decide the meaning of this language but merely highlight the change.

5. The *Jones* court examined a 1988 version of the statute identical to the language at issue in this case.

peals read section 41–6–19 as creating a "three part mechanism." *Id.* at 559. Subsection (1) imposes a duty on property owners to remove obstructing foliage. The statute conditions this duty, however, on the receipt of notice from the department of transportation or any local authority based on an engineering and traffic investigation that the vegetation has created a traffic hazard. Subsection (2) of section 41–6–19, like subsection (1), imposes a duty. In this case, it is a duty assigned to the entity which has conducted an investigation and determined that a traffic hazard exists to notify the owner to perform his subsection (1) duty. Third, the statute exposes the property owner to a class C misdemeanor in the event he fails to remove the obstruction within ten days.

¶ 32 Because Bountiful did not own the property upon which the rose bushes were situated, the court of appeals concluded that Bountiful owed the injured motorcyclist no duty to remove the obstruction. Moreover, the court noted that the statute imposed no duty on Bountiful to conduct an inspection, but rather burdened the city with a more limited responsibility to order the removal of the rose bushes if, after conducting an investigation, the city concluded that they constituted a traffic hazard. We find the court of appeals' reasoning in *Jones* to be sound and moreover to be amenable to extension to this case.

¶ 33 Of course, while Bountiful did not own the property upon which the rose bushes were growing, Nephi did own the land where the trees grew. Nephi, however, occupies the same position as it would had it not owned the property where the trees were located. The city's statutory obligation to remove the trees would have been triggered by receipt of notice from the department of transportation or a local authority—presumably including itself—that an investigation had deemed the trees to be a traffic hazard.

¶ 34 The statute, as the court of appeals correctly observed in *Jones,* does not impose a duty on Nephi, or any other governmental entity, to conduct an investigation of poten-

tial visual obstructions at the intersection of Center Street and the railroad tracks. In this respect, section 41–6–19 imposes a lesser duty than that created by common law, which would appear to require a property owner to exercise reasonable care to monitor the risks associated with vegetation growing on his property.

¶ 35 That Nephi should be treated for the purposes of evaluating its statutory duty as though it did not own the property upon which the trees were located is reinforced by the fact, made clear in subsection (2), that other governmental entities besides municipal agencies may be assigned the task to inspect for visual obstructions within the scope of their responsibilities. Most tellingly, the department of transportation is required by rule to have a program to identify railway crossing improvement needs. *See* Utah Admin. Code r. 930–5–7(1) (1998).[6] The department of transportation is also required to oversee a diagnostic/surveillance review team composed of members from railway companies, the department of transportation, and local government agencies. Included in the review team's tasks is the responsibility to "[s]pecif[y] removal of trees, brush and foliage from the highway and railway rights-of-way and private properties to provide better sight distance for motor vehicles." *Id.* r. 930–5–7(2)(b)(vi).

¶ 36 Under this regulatory scheme, it is clear the statute did not intend to assign exclusive responsibility to municipalities, like Nephi, to monitor railroad crossings within their boundaries for visual obstructions. We accordingly affirm the district court's determination that Nephi owed no statutory duty to Mr. Elder.

## CONCLUSION

¶ 37 Because we conclude the Railroad did not have a duty to ensure the trees did not impair motorists' view of approaching trains, we hold that it was not negligent in failing to remove the trees. We affirm the district court's summary dismissal of Mrs. Elder's

6. Although the governing agency has modified this rule slightly since 1998, the particular responsibilities enumerated here exist in the present-day rule.

wrongful death action with respect to the Railroad.

¶ 38 Although we conclude Nephi was under no statutory obligation to remove the trees, we vacate the district court's grant of summary judgment on the issue of common-law duty and remand for proceedings consistent with this opinion.

¶ 39 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Judge ORME concur in Justice NEHRING'S opinion.

¶ 40 Having disqualified herself, Chief Justice DURHAM does not participate herein; Court of Appeals Judge GREGORY K. ORME sat.