## UNITED STATES v. WOOTEN et al.
### No. 184.

Circuit Court of Appeals, Tenth Circuit.
April 14, 1930.

George A. H. Fraser, Sp. Asst. to the Atty. Gen.

Carl H. Gilbert, of Santa Fé, N. M. (M. W. Hamilton, of Santa Fé, N. M., on the brief), for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The United States, as guardian of the Indians of the Pueblo of Taos, sued to quiet the title to 78 tracts of land; the decision of the trial court was adverse to the government as to part of the tracts; and this appeal challenges the correctness of the decree as to twelve of them. While the facts differ somewhat in the twelve cases, one fact is common

to all of the cases, and that is that taxes levied by the state upon the lands prior to June 7, 1924 (the date of the Pueblo Lands Act [25 USCA § 331 note]), were not paid by the defendants prior to delinquency. When claimants must pay taxes in order to avail themselves of the rights given adverse possessors by the Pueblo Lands Act is the principal question in the case.

I. Before coming to the merits, a preliminary objection of the government to the form of the decree should be noticed. The decree, inter alia, provides:

"Now therefore it is ordered, adjudged and decreed that the title of each of the defendants hereinafter and in this paragraph named and as to the tracts hereinafter and in this paragraph designated, * * * be and it hereby is decreed to be quieted and set at rest in each of said claimants respectively as against the United States of America, the Pueblo of Taos and the Indians thereof. * * * It is further ordered, adjudged and decreed that this decree shall have the effect of a Deed of Quitclaim as against the United States of America, the Taos Pueblo and the Indians thereof."

The government contends, as to that part of the decree quieting title in the claimants, that the statute does not authorize an affirmative decree as against the United States; that no judgment or decree may run against the sovereign without its consent; and, there being no such consent, that part of the decree is erroneous. Illinois Cent. R. R. Co. v. Public Utilities Comm., 245 U. S. 493, 38 S. Ct. 170, 62 L. Ed. 425; Schaumburg v. United States, 103 U. S. 667, 26 L. Ed. 599; De Groot v. United States, 5 Wall. 419, 18 L. Ed. 700. Furthermore, that the defendants asked no affirmative relief, and that a decree must be responsive to the pleadings. Stanwood v. Des Moines Savings Bank (C. C. A. 8) 178 F. 670; Washington Railroad v. Bradley, 10 Wall. 299, 19 L. Ed. 894.

█ These general principles are not questioned. However, Congress has the power to authorize an affirmative decree without a prayer therefor. Section 4 of the statute (43 Stat. 636 [25 USCA § 331 note]) authorizes claimants to interpose a plea of limitations. Section 5 then proceeds:

"The plea of such limitations, successfully maintained, shall entitle the claimants so pleading to a decree in favor of them, their heirs, executors, successors, and assigns for the premises so claimed by them, respectively, or so much thereof as may be established, which shall have the effect of a deed of quitclaim as against the United States and said Indians, and a decree in favor of claimants upon any other ground shall have a like effect."

The act answers the contentions of the government. It provides that the plea here interposed, if successful, entitles the claimants "to a decree in favor of them" for the premises claimed. This directs an affirmative decree on a defensive plea. It further provides that such decree "shall have the effect of a deed of quitclaim as against the United States and said Indians." The decree here so provides. Did the court err when it further decreed that defendants' titles should be quieted against the United States and the Indians? It is immediately apparent that the objection, if sound, is without substance. A decree dismissing the bill, after a trial on the merits, forever bars the United States and the Indians from reasserting any claim to the land against the defendants and their privies in title. The decree as entered does no more. But the statute provides that the decree shall "have the effect of a deed of quitclaim." A quitclaim deed conveys whatever interest the grantors possess at the time. Devlin, Real Property and Deeds (3d Ed.) § 27. The words objected to have no further effect than a deed of quitclaim. They are superfluous, but harmless, and do not justify reversal or further attention.

II. Coming to the merits: Section 4, after authorizing a plea of limitations, provides in subsection (a) that, to support such plea, defendants who claim under color of title must prove "open, notorious, actual, exclusive, continuous, adverse possession" from January 6, 1902, to the date of the passage of the act, June 7, 1924. Subsection (b) makes the same requirements as to claimants without color of title, except they must prove possession from March 16, 1889. The trial court found that such requirements had been met, and no error is assigned as to such findings. In addition to these requirements as to adverse possession, a taxpaying requirement is made in both subsections. Subsection (a) provides that the claimants must prove that they "have paid the taxes lawfully assessed and levied thereon to the extent required by the statutes of limitation, or adverse possession of the Territory or of the State of New Mexico, since the 6th day of January, 1902, to the date of the passage of this Act, except where the claimant was exempted or entitled to be exempted from such tax payment."

Subsection (b) is identical, save that, while it requires possession from March 16, 1889, tax payments are required only from 1899.

The undisputed facts are that all of the taxes for the period prior to June 7, 1924, had been paid by the claimants prior to the filing of this suit, excepting in certain instances where the trial court held the taxes were not "lawfully assessed." In each of the cases, the claimant had failed to pay the lawful tax for one or more of the years prior to 1924, until after such tax had become delinquent under the New Mexico statute; in one instance none of the taxes for the years 1919 to 1924 was paid until 1926, when all were paid. In one instance a tax of $2.84 for the year 1915 was not paid until 1926. In several instances ex-soldiers, in reliance upon a state exemption statute later held unconstitutional, did not pay their 1920 tax until after 1924. But in no case did the land go to tax sale, nor did any one else, except the claimants or their predecessors in interest, pay the taxes. This suit was filed in August, 1927.

Before considering the time element in the payment of taxes, it is appropriate to refer to the claims of appellees that no tax payments at all are required of any of the defendants, or from any claimants of lands acquired by the Indians by grant from the governments of Spain, Mexico, or the United States, as distinguished from lands acquired by the Indians by purchase. The Pueblo Lands Act requires the payment of only such taxes as may be "lawfully assessed and levied" on the land. Appellees argue that these Indian lands were never subject to lawful assessment. It is true, of course, that Indian lands are not subject to state taxation, except with the consent of Congress. It is likewise true that by the Act of March 3, 1905 (33 Stat. 1069), Congress expressly exempted Pueblo lands from taxation; and the Constitution of the state of New Mexico carries a like exemption. Article 21, § 2. The argument is plausible, but does not fit into the provisions of the act. Congress undoubtedly was advised of the situation when it passed the act. It cannot be presumed that the requirement as to taxes was inserted for no purpose. Yet, if the tax requirement is limited to Indian purchase land, it is conceded in argument that it is of no practical effect, for the reason that, as far as is known, no Indian land has been acquired by purchase since 1848, and the statute concerns itself with the years 1899 to 1924. Furthermore, several times in the act Congress dif-

ferentiated between "grant" and "purchase" lands. If Congress had intended to so differentiate in section 4, it would have used the same apt language it employed elsewhere in the act for that purpose.

Nor does appellees' argument fit into the intent of the statute, which is, after all, the criterion. Where doubt exists the courts may, and should, look to the situation which confronted Congress. Ozawa v. United States, 260 U. S. 178, 43 S. Ct. 65, 67 L. Ed. 199; Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; United States v. Ninety-Nine Diamonds (C. C. A. 8) 139 F. 961, 2 L. R. A. (N. S.) 185; Hughes v. Com'r (C. C. A. 10) 38 F.(2d) 755. In reliance upon the Joseph Case, 94 U. S. 614, 24 L. Ed. 295, and decisions of the New Mexico Territorial Court (United States v. Lucero, 1 N. M. 422; United States v. Santistevan, 1 N. M. 583; United States v. Joseph, 1 N. M. 593; Pueblo of Nambe v. Romero, 10 N. M. 58, 61 P. 122) the public had treated the Pueblo Indian as sui juris, with a perfect and alienable title to his lands. His lands had been purchased, improved, mortgaged, and sold. The Sandoval Case, 231 U. S. 28, 34 S. Ct. 1, 58 L. Ed. 107, and the Candelaria Case, 271 U. S. 432, 46 S. Ct. 561, 70 L. Ed. 1023, held to the contrary. Congress confronted a situation where people had purchased lands in reliance upon existing law, paid for them, improved them, and claimed to own them. These people had strong moral claims which Congress expressly recognized by section 4 of the act. But Congress laid down the specifications for such claimants; if their proof measured up, their titles were good; if not, they were not. One of the specifications was adverse possession; another was the payment of taxes, for a claimant naturally would have paid taxes on the land, if he had secured the good title from the Indian which he supposed he was getting. The moral claim of a settler who bought from an Indian who owned "grant" land, was no stronger than the moral claim of a settler who bought from an Indian who owned "purchase" land. There is no fair reason to suppose Congress intended to impose a heavier burden of proof upon one than upon the other. The truth must be that Congress intended that a claimant could not prevail unless his claim was buttressed by that excellent proof of a claim of ownership, the payment of taxes; that a man, now claiming to have been in possession for many years under assertion of right, must have been consistent through the years, and have paid the taxes that were lawfully assessed,

and which he would have paid if he had been the owner. In short, Congress intended by "lawfully assessed and levied" those taxes which were assessed and levied in accord with the laws of the state of New Mexico; and did not intend to make an illogical and unreasonable classification between settlers of equal claims, dependent upon the origin of the Indian title.

■ III. Appellees further contend that they are under no obligation to pay taxes, because the act only requires such payment "to the extent required by the statutes of limitation, or adverse possession of the Territory or of the State of New Mexico"; that while section 3365, Code of N. M. 1915, requires payment of taxes, section 3364 does not; and that section 3364 is the statute applicable to lands granted by Spain, Mexico, or the United States, and hence to the lands herein involved.

This same argument, together with the preceding one as to the meaning of "lawfully assessed," was made by the same counsel to the District Court of New Mexico, in the Pueblo of Nambe Case. These contentions were denied by that court, Judges Neblett and Phillips joining in a per curiam opinion. That case was not appealed, and the opinion is unreported. We have considered it with care; its analysis of the New Mexico statutes, their history, and the decisions appertaining thereto, is exhaustive and convincing, and the conclusion reached meets the full approval of this court. A brief statement will suffice for this opinion.

The New Mexico statutes of limitation and adverse possession may be grouped:

(a) Prior to March 16, 1899, by section 2938, Comp. Laws, N. M. 1897, the limitation for the recovery of real property was 10 years; whether the defendant had color of title, or whether his possession was adverse or in good faith, or whether he had paid taxes, was immaterial. It was a strict statute of limitations. This statute was section 5 of chapter 17 of the Laws of 1858.

(b) On March 16, 1899 (Laws N. M. 1899, c. 63, § 2), that statute was amended by providing that the limitation was only effective in suits "against any one having adverse possession of the same continuously in good faith, under color of title, and who has paid the taxes lawfully assessed against the same." In March, 1905 (Laws N. M. 1905, c. 76), it was again amended by adding a definition of "adverse possession," and by a more particular definition of taxes. The 1905 amendment drops the tax phrase above quoted, and adds the following sentence:

" 'Adverse possession' is defined to be an actual and visible appropriation of land, commenced and continued under a color of title and claim of right inconsistent with and hostile to the claim of another; and in no case must 'adverse possession' be considered established within the meaning of the law, unless the party claiming adverse possession, his predecessors or grantors, have for the period mentioned in this section continuously paid all the taxes, territorial, county and municipal, which during that period have been levied upon the land or interest claimed, whether assessed in his name or that of another."

This statute is now section 3365, Code of 1915. By the 1899 amendment, it became a statute of limitation and of adverse possession. Montoya v. Heirs, 16 N. M. 349, 120 P. 676. Thenceforth the 10-year limitation was only available to those (1) having actual and visible adverse possession of the land continuously and in good faith, (2) under color of title and claim of right inconsistent with and hostile to the claim of another, and (3) shall have paid the taxes thereon as required.

Clearly this is an adverse possession as well as a statute of limitations.

(c) Section 3364 was section 2, c. 17, Laws of 1858, being the chapter which contained original section 3365. It reads:

"In all cases where any person or persons, their children, heirs or assigns shall have had possession for ten years of any lands, tenements, or hereditaments which have been granted by the governments of Spain, Mexico or the United States or by whatsoever authority empowered by said governments to make grants of lands, holding or claiming the same by virtue of a deed or deeds of conveyance, devise, grant or other assurance purporting to convey an estate in fee simple, and no claim by suit in law or equity effectually prosecuted shall have been set up or made to the said lands, tenements or hereditaments, within the aforesaid time of ten years, then and in that case, the person or persons, their children, heirs or assigns, so holding possession as aforesaid, shall be entitled to keep and hold in possession such quantity of lands as shall be specified and described in his, her or their deed of conveyance, devise, grant or other assurance as aforesaid, in preference to all and against all, and all manner of persons or persons whatsoever. * * *"

The Supreme Court of New Mexico has considered these two statutes, and has held that section 3364 creates "a right and title as

to real property acquired in a land grant and provided another and different rule of limitation as to real property which might be adversely acquired under section 2938 [3365] * * * It will be seen, therefore, that while section 2938 has been amended so as to require color of title in good faith, payment of taxes, and made specifically an adverse possession statute, and the term 'adverse possession' has been defined by the statute, not one of these provisions have been inserted by amendment in section 2937 [3364]." Montoya v. Heirs, 16 N. M. 349, 120 P. 676, 687.

Appellees' argument is that, by the Pueblo Lands Act, Congress was distinguishing between "grant" lands, covered by section 3364, and "non-grant" lands covered by section 3365. But from the internal evidence of the act itself, the contrary conclusion results. The differences between 4(a) and 4(b) of the Pueblo Lands Act are that 4(a) demands color of title and possession since January 6, 1902, ten years prior to statehood; while 4(b) demands no color of title, but possession since March 16, 1889, ten years prior to the amendment of section 3365. The differences between 4(a) and 4(b) are the essential differences between section 3365 before March 16, 1899, and the same section afterward; and Congress used the date March 16, 1889, which corresponds to the date of the amendment of section 3365. As we interpret the New Mexico decisions, section 3364 creates, or confirms, title to certain lands as described in certain instruments; while section 3365 protects the rights of certain persons in so much land as may be adversely possessed by them. We cannot escape the conclusion that in enacting 4(a) and 4(b) Congress was pointing directly at section 3365, as it existed before and after the amendment of March 16, 1899.

Furthermore, appellees' argument again ascribes to Congress the intent to distinguish between the moral claims of settlers who purchased and improved "grant" lands, and those who purchased and improved "non-grant" lands, an arbitrary and unreasonable classification that is not lightly to be imputed. In our opinion Congress did not consider section 3364 at all.

Congress itself required the payment of taxes. The requirement is "and have paid the taxes lawfully assessed and levied." The New Mexico statutes are referred to only to measure the extent of payment—the words are "to the extent required by the statutes" of New Mexico. It is hard to conceive of Congress pointing to a nontaxpaying statute to measure the *extent* of a taxpaying obligation.

We conclude that a claimant of Pueblo lands must (a) prove the adverse possession described by the act from the respective dates to June 7, 1924; (b) that he must have paid all taxes on the lands claimed which were assessed and levied in conformity with New Mexico laws, from the respective dates to June 7, 1924, unless exempt therefrom; (c) that the extent of the payment required is measured by section 3365, Code of 1915.

IV. Section 3365 requires that the claimant shall have "for the period mentioned in this section continuously paid all the taxes" levied by state or municipal authorities. Save in one or two instances separately noticed, it is conceded that prior to the filing of this suit, in 1927, the claimants, or their predecessors in interest, had paid all such taxes which were assessed from 1899, or 1902, down to and including 1924; by 1927, they had paid up all the taxes, interest, and penalties, levied during the periods involved, and were square with the state. The payments had not been interrupted by others paying, or by failure to pay for certain years, or by tax deeds. However, in none of the cases had the taxes for all of the years been paid before delinquency. The government contends that the taxes must not only all be paid, but each year's taxes must be paid before delinquency; that a settler loses his rights if the 1906 tax, for example, was not paid until July of 1907.

This argument is grounded upon the word "continuously," which we had supposed meant without break or interruption. Counsel for the government, in his brief, defines it otherwise variously as "regularly," "promptly and completely," "promptly and regularly," with "punctuality," "when due," etc. Suffice it is to say, that, unless there is controlling authority, or commanding reason from the context, this court cannot construe "continuously" into "promptly." If Congress had intended that the claim of these settlers should be defeated if, at any time in the 22-year stretch, the settler had not paid his taxes until they became delinquent, it could easily have said so by inserting the words "promptly" or "before delinquency." Or, if the New Mexico Legislature had intended the same thing, it could have accomplished the result sought, by similar wording in section 3365. When two legislative bodies have overlooked the opportunity to aptly word their statutes to express a requirement of punctuality, we are not justified in supplying the omission.

Counsel contends that the act requires that claimants "must have paid all taxes continuously from 1899, or 1902, to 1924." The act is otherwise; it requires payment of taxes "levied thereon * * * from the 16th day of March, 1899, to the date of the passage of this Act." Section 4(b). That is, the time limits apply to levy and not to payment. Counsel further contends that the word "all" in the New Mexico statute requires that the taxes must be completely paid; that, therefore, continuously must be construed as "before delinquency" or be given no meaning. As we read this statute, one claiming under it must show that he has paid "all" (not a part of those levied) "continuously" (for each of the years of the period). But even if it be tautology, that common fault of legislative draftsmen does not, in our opinion, justify impressing upon a word a meaning it does not have.

The New Mexico courts have not construed the statute; many cases, from other jurisdictions, have been cited as bearing upon the necessity of payment of taxes before delinquency, where there is a taxpaying requirement in an adverse possession statute. We have examined these cases, and the statutes upon which they are based. There is not complete harmony in the cases; but to discuss the cases would require an analysis of the statutes, and unduly prolong this opinion. After all, each statute has its own background, which must not be overlooked. This act of Congress was passed to meet a peculiar situation that arose after the decision of the Sandoval and Candelaria Cases. In very rough outline, we think Congress intended to protect the rights of settlers who would have acquired property rights, without color of title, under the New Mexico law as it existed prior to March 16, 1899. Where there was color of title, Congress used the date 10 years prior to statehood; and recognized such claims resting on possession and color of title since January 6, 1902. But to both classes, it made additional requirements —a continued possession on down to 1924, and the taxpaying requirement. It agreed to recognize claims so accrued, provided that the claim and possession had continued until 1924, without interruption. And so of taxes; Congress was not concerned about whether the settler paid taxes promptly, or whether the tax officials of New Mexico acted vigorously or otherwise. It was concerned with the good faith of the settler, and was saying that a settler who has claimed ownership through the years must be consistent; if he claimed ownership to the Pueblo Lands Board, he must have assumed ownership to the state through the years, by paying taxes like other owners. In short, there is no reason apparent why a harsher burden should be put on these settlers, as to their taxes, than on their neighbors. Under the New Mexico law, the owner can go to the office of the treasurer, and, as a matter of right, clear his land of all tax claims, by paying the taxes, interest, penalties, and costs, at any time before tax sale. The ordinary man, reading this statute, would conclude that he is "paying taxes" if he pays money to a county treasurer to discharge his property of liens arising from assessments made by taxing authorities. If, in 1924, all the taxes levied since 1899 have been paid by John Smith; if during those years no one else has paid them or had a right to pay them; if he has never let the land go to tax sale—we think John Smith can honestly say that he has continuously paid all the taxes levied on the land since 1899. We agree with counsel for the government that "Congress evidently made tax payments a portion of the test, because the full and regular payment of taxes is the best evidence of a genuine and continuous claim of title in good faith." We agree that the circumstances of delinquency might be such that it would reflect upon the good faith of his possession, as required in other parts of the section, even if the payments are made "continuously" as herein interpreted; but here the trial court has found good faith, and its finding in that respect is not challenged.

Although it has not been urged, we have noted that in the 1899 amendment, the word "continuously" is not used in connection with the taxpaying requirement, but was first used in the 1905 amendment. Ordinarily the insertion of a word in a statute by amendment should be accorded particular significance. However, in the 1899 amendment the taxpaying requirement was a part of the sentence requiring possession "continuously"; by the 1905 amendment, the taxpaying requirement was separated from the word "continuously"; it was put into a new sentence defining adverse possession, and more particularly specifying the taxes to be paid; and it was but natural to repeat the word "continuously." In any event, to construe the word as "promptly" or "before delinquency" appears to us to be unjustified, and not in keeping with the spirit of the statute. We therefore hold that, if a settler has paid all the taxes assessed, with penalties and interest, for all of the years involved, prior to the filing of the suit, and prior to tax sale, he has complied with the taxpaying requirement of

the act. The question of whether taxes may be paid after tax sale, but before the expiration of the period of redemption, is not presented by this record, and is not decided.

V. With reference to the particular claims: In some of the claims the evidence showed that for a particular year the taxes were not paid at all. The trial court held that the taxes were not "lawfully assessed and levied" because of errors in the description. The New Mexico Supreme Court has just decided, in the case of Ferguson v. Gusdorf, 290 P. 214, that descriptions in tax assessments must be "sufficient, unaided, to identify the land." That decision is under an early statute, but on the whole we conclude that the trial court correctly applied the New Mexico statutes. As to one claim, No. 76, the evidence shows that the taxes from 1919 to 1924 had not been paid when the suit was filed. During the progress of the trial, a state court decreed that the assessment was unlawful, in that it was excessive, and the description indefinite. The question presented to the trial court in this case was whether, at the date of filing the petition, any taxes "lawfully assessed" were unpaid. The trial court necessarily found this assessment unlawful. The state court has also so decreed. The claim cannot be defeated therefore because of the nonpayment of unlawful assessments. The circumstances concerning the taxes on this property reflect upon the good faith of the claim of possession; but the trial court has found good faith; the finding is not attacked, and the evidence thereon not before us, and it cannot therefore be reviewed.

The decrees are, in all respects, affirmed.