2011 UT 9

**HOLLADAY TOWNE CENTER, L.L.C.,**
Plaintiff and Petitioner,

v.

**BROWN FAMILY HOLDINGS, L.L.C.,**
Defendant and Respondent.

No. 20090050.

Supreme Court of Utah.

Feb. 1, 2011.

James L. Ahlstrom, Robyn L. Wicks, Salt Lake City, for plaintiff.

Blake S. Atkin, William O. Kimball, Joseph H. Pugsley, Bountiful, for defendant.

Justice LEE, opinion of the Court:

¶ 1 This case arises out of a contract dispute over the terms of a lease agreement. The principal issue on appeal concerns which party (landlord or tenant) bore responsibility under the lease to incur the expense of quieting title when an easement interfering with tenant's ability to obtain financing for the development of the property was identified. We conclude that the parties to this lease assigned the expense and burden of quieting title to the tenant, and accordingly affirm.

I

A

¶ 2 The Petitioners, Holladay Towne Center, L.L.C. ("HTC"), entered into a lease agreement (the "Lease") with Respondents, Brown Family Holdings, L.L.C. ("Brown"), to lease and commercially develop a particular property (the "Property" or "Lot 27"). Brown previously acquired the Property in 1994, at which time it received a clear title report from United Title Services of Utah, Inc., a division of First American Title Insur-

ance Company.[1] In 2004, prior to entering into the Lease, HTC obtained a similar clear title report from the Talon Group, likewise a division of First American Title Insurance Company. Then in 2006, after the execution of the Lease, and for reasons not entirely clear in the record, HTC requested a third title report. This third title report revealed an affirmative easement for ingress, egress, and parking listed on the chain of title for an adjoining lot ("Lot 26"). This easement is at the center of the present dispute.

¶3 The Lease contemplates two events. First, Brown was to deliver possession of the property to HTC, who would possess the property for a period of twenty years subject to the terms of the Lease. Second, after a period of five years, HTC would be permitted to exercise an option to purchase the Property. The option provision states that upon exercise, the Property "shall be conveyed using a general warranty deed." The Lease expressly recognizes HTC's intention to build a shopping center with retail stores and offices on the premises, and grants to HTC a "fee estate" in "any structures hereafter constructed on and affixed to" the Property. The record suggests that both HTC and Brown anticipated that HTC would exercise the option to purchase the Property after the initial five-year term had expired.

¶4 The Lease contains several provisions relating to the delivery and possession of the Property. One is the "Demise" provision, which states

> 1.1 Demise. Landlord hereby leases to Tenant the Premises, together with all rights, privileges, easements, and appurtenances belonging to or in any way appertaining thereto, including but not limited to, any and all surface easements, rights, titles, and privileges of Landlord now or hereafter existing in and to adjacent streets, sidewalks and alleys for the Term, at the rental, and upon all the covenants and conditions set forth herein.

The Landlord's Estate is defined as "all of Landlord's right, title, and interest in its fee estate in the Premises, its reversionary interest in the Improvements pursuant hereto, and all other Rent and Benefits due Landlord hereunder." According to the "Recitals," Brown is the "Landlord [and] . . . the fee owner of [the Property] . . . together with all rights and interest, if any, of Landlord in and to the land lying in the streets and roads in front thereof and adjoining thereto and in and to any easements or other rights appurtenant thereto." The Lease contemplates a single "Permitted Exception" to this delivery of all of Brown's rights pertaining to the property: After the execution of the Lease, Brown is still accountable for the "Property Taxes and Assessments accruing for the year 2005 and thereafter."

¶5 Additionally, there are a number of provisions allocating particular rights and duties to the tenant during the pendency of the Lease. Chief among these is the "Compliance with Laws" clause, which states:

> 6.3 Compliance with Laws. Subject to the Provisions of Article 8 below,[2] Tenant shall comply with all Legal Requirements in the use, occupation, control and enjoyment of the Premises and in the prosecution and conduct of its business thereon. Tenant shall have the right, at its own cost and expense, to contest or review by appropriate legal or administrative proceeding the validity or legality of any such Legal Requirements, and during such contest Tenant may refrain from complying therewith provided that compliance therewith may legally be held in abeyance without subjecting Landlord to any liability, civil or criminal, of whatsoever nature for failure so to comply therewith and without the incurrence of a lien, charge or liability against the Premises or Landlord's Estate; and provided further that all such proceedings shall be prosecuted by Tenant with due diligence.

The Lease further defines "Legal Requirements" as follows:

---

**1.** A "Commitment for Title Insurance" was issued with an effective date of December 28, 1994. This title report made no mention of the easement at issue in this case.

**2.** Article 8 pertains to "Environmental Matters" and states in relevant part that "Tenant shall at all times comply with applicable Environmental Laws affecting the Premises."

"Legal Requirements" means all present and future laws, statutes, requirements, ordinances, orders, judgments, regulations, administrative or judicial determinations, even if unforeseen or extraordinary, of every governmental or quasi-governmental authority, court or agency claiming jurisdiction over the Premises now or hereafter enacted or in effect (including, but not limited to, Environmental Laws and those relating to accessibility to, usability by, and discrimination against, disabled individuals), and all covenants, restrictions, and conditions now or hereafter of record which may be applicable to Tenant or to all or any portion of the Premises, any of the Premises, even if compliance therewith necessitates structural changes to the Improvements or the making of Improvements, or results in interference with the use or enjoyment of all or any portion of the Premises.

¶ 6 Finally, the Lease is characterized as a "triple net lease" in which the "tenant agrees that the amount of annual rent will be paid without offset and that the tenant will pay all impositions and costs relating to the property so that the Landlord has no cost or expense relating to the property during the term or any extension of the lease."

¶ 7 On December 22, 2004, prior to entering into the Lease, HTC (then Thomas Fox Properties) obtained a "Commitment for Title Insurance" (the "First Report") from the Talon Group, a division of First American Title Insurance Company (the "Talon Group"). The First Report made no mention of the Easement. In early 2006, after entering into the Lease agreement, HTC's counsel reviewed a survey map of the Property and discovered a possible easement in favor of an adjoining parcel ("Lot 26"). HTC then asked Joseph Capilli of the Talon Group to investigate the Property's title and the possible easement.

¶ 8 Capilli's research revealed that (1) prior to August, 1980, Lot 27 and adjoining Lot 26 were owned by the same owner, and (2) that in August, 1980, Lot 26 was transferred with an easement recorded against Lot 26 for parking, ingress, and egress. This Easement was recorded only on the chain of title for Lot 26 and is not listed in the chain of title for Lot 27.

¶ 9 Nothing in the record suggests that either party had actual notice of the existence of the Easement at the time of the execution of the Lease. There is no physical evidence of the Easement. The path for "ingress and egress" has been obstructed for two decades by impassable berms and for the past ten years by storage units. As noted above, both parties had on separate occasions received Title Reports making no mention of the Easement.

¶ 10 In an April 7, 2006, letter HTC's then-counsel William Gray of Miller Guymon, P.C., advised Brown of the existence of the Easement, asserting that "the existence of the easement completely defeats the purpose of the Lease for our client and constitutes a material breach." The letter further claimed that an Easement upon the land is not one of the Permitted Exceptions to the Lease and demanded that Brown take steps to "cure the default" of the Lease within 30 days. Brown refused to take steps to address the Easement. On or about May 31, 2006, Capilli met with Rand and Pamela Brown as well as Thomas Hulbert, HTC's manager, and discussed his findings with regard to the Easement. In this meeting, Capilli stated that he "would not be able to issue a title insurance policy for the Property, without excepting the Easement from such policy."

¶ 11 Capilli then prepared the second "Commitment for Title Insurance" (the "Second Report"), dated September 21, 2006, on behalf the Talon Group. The Second Report was again issued to Thomas Fox Properties for Lot 27, this time excepting the Easement.[3] From November of 2005 and for approximately four months following, HTC consistently made late payments to Brown, in an apparent attempt to persuade Brown to pursue a quiet title action for Lot 27. This conduct was stopped upon the demand of Brown, and HTC subsequently has made

---

**3.** The second "Commitment for Title Insurance" states in pertinent part that the Property is "[s]ubject to a right of way for parking and ingress and egress over a portion of the subject property as contained in that certain Notice of Contract Recorded August 20, 1980."

consistent, on-time payments. HTC maintains that, as a result of the Easement and its inclusion on the Second Report, it cannot obtain the financing necessary to begin the commercial development that it bargained for in the Lease.

## B

¶ 12 HTC initiated the present action against Brown by filing a complaint on August 9, 2006, asserting claims for declaratory judgment, breach of contract, and specific performance. Brown filed a motion to dismiss in response. Brown subsequently filed a counterclaim, alleging breach of contract, breach of good faith and fair dealing, waste of premises, and unjust enrichment. In December 2006, HTC moved to dismiss Brown's counterclaim and moved for summary judgment on HTC's claim for declaratory judgment and specific performance. In early 2007, Brown filed a cross-motion for summary judgment on, among other things, its breach of contract claim. Oral arguments were heard by Judge John Paul Kennedy on both the motions to dismiss and the motions for summary judgment on March 12, 2007.

¶ 13 On May 1, 2007, Judge Kennedy issued his "Findings of Fact, Conclusions of Law, and Order." Three of the trial court's "Conclusions of Law" are relevant to this appeal. Judge Kennedy first concluded that "[t]here is no easement on lot 27," citing two bases for this conclusion: (a) "[t]here is no evidence of an easement on the ground," and (b) "to the extent that an easement purporting to affect lot 27 is recorded against lot 26, that easement is void because it was not recorded against lot 27." "Because there is no easement affecting lot 27," Judge Kennedy found that "there is no basis for the plaintiff's claims against the defendant and this action should not have been brought against the landlord causing the landlord to incur costs." Finally, "[i]f the easement . . . creates legal requirements that interfere with plaintiff's use of its leasehold," Judge Kennedy concluded that "plaintiff has the right under the lease . . . to contest those legal requirements by quiet title action or otherwise."

## C

¶ 14 HTC appealed the trial court's decision, arguing that the district court erred by (1) "concluding that HTC had standing to challenge the Easement," (2) "ruling on the validity of the Easement as between the existing parties," and (3) "interpreting the Lease to place the obligation of challenging the Easement on HTC rather than the Browns." *Holladay Towne Ctr., L.L.C., v. Brown Family Holdings, L.C.*, 2008 UT App 420, ¶ 6, 198 P.3d 990. Brown filed a cross-appeal, challenging the trial court's conclusion that HTC had not materially breached the Lease. *Id.* ¶ 14.[4]

¶ 15 The court of appeals, in a decision by Judge Thorne, found that "[i]n light of the language of the Lease, it is clear that the parties contracted so as to anticipate and resolve the very dispute presented in this appeal." *Id.* ¶ 10. The court then determined that the language of the Lease "clearly indicates that HTC may, independently of the Browns, challenge the validity of the Easement." *Id.* ¶ 12. The court further stated that "[t]he Easement, to the extent it may have any validity, is clearly a covenant, restriction, or condition of record that affects both the Premises and HTC's use and enjoyment thereof." *Id.*

¶ 16 In a footnote, the court reasoned that there was no need "to address HTC's standing concerns, or its argument that the district court erred in addressing the validity of the Easement as between the parties." *Id.* ¶ 13 n. 3. The court reached this conclusion "[i]n light of [its] determination that HTC may challenge the Easement regardless of its validity." *Id.* Thus, the court concluded that HTC may challenge the Easement, without finding that HTC had standing to do so.

¶ 17 HTC filed a petition for writ of certiorari, which we granted to resolve the questions (1) whether the court of appeals cor-

---

4. With regard to the cross-claim regarding material breach for late payment of rent, the court stated that "[i]f it was intended that the repeated late payment of rent under the default provision would itself constitute a default, the parties could have so provided in the Lease. They did not." *Holladay Towne Ctr.*, 2008 UT App 420, at ¶ 16, 198 P.3d 990.

rectly interpreted the contract as requiring HTC to resolve an undisclosed easement, and (2) whether a lessee may acquire standing to quiet title by the terms of a Lease.

■■■ ¶ 18 This court reviews questions of contract interpretation for correctness. *Fairbourn Commercial, Inc. v. Am. Hous. Partners, Inc.*, 2004 UT 54, ¶ 6, 94 P.3d 292; *Zions First Nat'l Bank, N.A. v. Nat'l Am. Title Ins. Co.*, 749 P.2d 651, 653 (Utah 1988). Likewise, "a determination of standing is generally a question of law, which we review for correctness." *Mellor v. Wasatch Crest Mut. Ins., Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004.

D

¶ 19 HTC argues that the court of appeals misapplied and disregarded established principles of contract law in (1) failing to give effect to the plain meaning of the contractual terms of the Lease, (2) failing to harmonize and give effect to all of its terms, and (3) creating an absurd result through its interpretation of the Lease.

¶ 20 With regard to plain meaning, HTC acknowledges that the Legal Requirements clause of the Lease gives HTC the responsibility of resolving "all covenants, restrictions, and conditions ... to the use, occupancy, possession, operation, maintenance, alteration, repairs, or restoration of any of the Premises," but argues that this language does not include easements. HTC suggests that "covenants, restrictions, and conditions" are terms of art in property law and that "an easement is essentially an inherently legal interest in land, as distinct from a restrictive covenant, which has been described as but a creature of equity arising out of contract." (quoting Jeffrey J. Shampo, *Covenants* § 3, 20 Am.Jur.2d).

¶ 21 HTC further argues that the court of appeals misinterpreted the term "triple net lease" to suggest that Brown ought not to incur any "monetary obligations as a result of HTC leasing the Premises." HTC argues that a "triple net lease" frees Brown only from the obligation to pay use-related expenses. HTC then claims that the court of appeals failed to harmonize all the terms of the Lease, noting that paragraph 6.3 deals

only with the Tenant's requirements in "the use, occupation, control and enjoyment of the Premises," and makes no reference to the Tenant's responsibilities regarding the quality of title. HTC further notes that the "Legal Requirements" definition references only "covenants, restrictions, and conditions" affecting the "use, occupancy, [or] possession of the land," but not, like the Easement, its title. HTC argues that the existence of the Easement on the land is inconsistent with a conveyance in fee simple of "all rights and privileges" owned by the Landlord, and excepting only those "taxes and assessments" listed in Exhibit B of the Lease.

¶ 22 HTC further argues that the court of appeals reached an absurd result, asserting that interpreting the "Legal Requirements" language to include an obligation to quiet title will mean that such language "will be deemed to trump even express representations made by the landlord as to the quality/status of title." "Such a result," HTC argues, "will literally dismantle real property leasehold law in Utah."

¶ 23 Finally, HTC concludes that, although the court of appeals did not reach the issue of standing, its interpretation of the contract "effectively recognizes and endorses contractual provisions that confer legal standing." In HTC's view, "legal standing cannot be contractually conferred," and the Lease accordingly cannot be construed to impose on HTC an obligation to assert a claim to challenge the validity of the Easement-a claim it purportedly has no standing to assert. Standing, HTC notes, is a question of subject-matter jurisdiction, and in its view parties cannot "confer jurisdiction upon the court" by contract.

II

¶ 24 Although the trial judge found that no valid easement encumbers the Property, we find for reasons explained below that this case still presents a live controversy. Because the Lease makes no express warranty that the Property is free of encumbrances and because the Lease contemplates that HTC will pay all "costs relating to the property so that the Landlord has no cost or expense relating to the property during the

term or any extension of the lease," we conclude that HTC bears the burden of quieting title to the Property under the Lease. Further, because HTC acquired a present possessory interest in the Property pursuant to the Lease, together with the option to purchase the Property, we hold that HTC has sufficient interest to acquire standing to quiet title under Utah law.

## A

[3] ¶ 25 Before proceeding to the arguments presented by counsel, we must first address the question whether this case presents a live controversy. *Ellis v. Swensen,* 2000 UT 101, ¶ 25, 16 P.3d 1233 ("Ordinarily we will not adjudicate issues when the underlying case is moot.... A case is deemed moot when the requested judicial relief cannot affect the rights of the litigants." (internal quotation marks omitted)). Whether or not addressed by the parties, we may raise questions of mootness on our own motion. *Shipman v. Evans,* 2004 UT 44, ¶ 36, 100 P.3d 1151 ("[A] court may properly raise sua sponte the issue of mootness.").

[4] ¶ 26 The parties in this case ask us to determine who bears the responsibility under a lease to remove a supposed "cloud" of title created by an easement *after* a court of competent jurisdiction has determined that no such easement exists. Judge Kennedy found that "[t]here is no evidence of an easement on the ground and to the extent that an easement purporting to affect lot 27 is re-

corded against lot 26, that easement is void because it was not recorded against lot 27." Neither this court nor the court of appeals has been asked to review the correctness of these conclusions. Brown observes that "[t]he effect of this unchallenged fact is obvious. Brown cannot have breached the Ground Lease by refusing to bring a quiet title action with regard to an easement that does not exist under Utah law." Because the Easement creates a "cloud" on the title, HTC responds that it "is hindered from obtaining financing for development of or construction of the shopping center on the Property in the manner contemplated by the Lease." Consequently, because "reversal would mean that Brown is required to address the cloud of title caused by the Easement regardless of the validity or invalidity of the same, the trial court's determination as to the validity or invalidity of the Easement is of no moment to the current cert review."

¶ 27 Though we have no reason to doubt Judge Kennedy's conclusions about the validity of the contested easement, his resolution of that issue binds only the parties to the present action. This is because the judgment of the trial court does not extend to the owner of Lot 26, who was never joined. *See Fisher v. Davis,* 77 Utah 81, 291 P. 493, 494 (1930) (holding that a decree to quiet title can bind only the parties to the action). Judge Kennedy stated his concern about the potential limitations of his ruling to the parties,[5] and both HTC[6] and Brown[7] proceeded to

---

5. Judge Kennedy articulated this view at the Summary Judgment Hearing:

 THE COURT: How could I say that there is an easement or isn't an easement unless someone who holds the easement is here in court?

 Judge Kennedy similarly characterized his ruling as to the existence of the Easement at the Hearing on the Proposed Order:

 THE COURT: I think it's correct to say that that doesn't necessarily mean there is no easement because I suppose someone could come in and establish an easement with evidence that we don't have right now.

 * * *

 THE COURT: [I]t just extends to the litigants and others who might be bound by other rules of procedure.

6. Counsel for HTC made a similar observation at the Hearing on the Proposed Order:

 MR. MILLER: First, I don't think there's a finding that there is no easement generally but only as between these two parties.... Your [sic] finding that there is no easement with regard to the lease and these two parties.

7. Counsel for Brown likewise said the following at the hearing:

 MR. ATKIN: The Court's judgment was that there is no easement and while it may be true that a third party might be able to come in and say, well, I'm not bound by that judgment, that burden should be on the third party that's coming in to try and make that kind of an argument. There's no reason for this court to couch its decision in caveats that there might be somebody out there that might be able to assert that they are not bound by the judgment. The court had before it two parties and the Court ruled that there was no easement based

adjudicate the present controversy aware of these limitations but without ever joining the owner of Lot 26 as a party. Consequently, regardless of what would seem to have been a more efficient, less costly, and ultimately more reasonable resolution of this case (i.e., a quiet title action with the owner of Lot 26 joined as a party), the parties have chosen instead to adjudicate the question of who is obliged to quiet title. In the absence of the owner of Lot 26, the title could not be quieted, and the question of whose duty it is to quiet the title continues to present a live case and controversy.

### B

¶ 28 Despite HTC's repeated assertions to the contrary, the Lease at issue in this case does not warrant that the Property is free of encumbrances. Brown has merely delivered to HTC a possessory interest of everything that Brown possessed in the Property.

¶ 29 HTC relies primarily on three Lease provisions to assert that Brown represented that it was conveying the Property free of encumbrances: (1) the Lease's characterization of Brown as the "fee owner" of a "fee estate"; (2) Brown's conveyance of "all rights, privileges, easements, and appurtenances" of the Premises or "all surface easements, rights, titles, and privileges"; and (3) the Permitted Exceptions clause. None of these provisions, however, contains any warranty that the title is free from encumbrances.

 ¶ 30 The Lease characterizes Brown as the "fee owner" of a "fee estate." HTC contends that an easement is an encum-

brance that "undermine[s] fee simple title." We disagree. The existence of an easement is not inconsistent with a fee simple ownership.[8] Because fee ownership is not inconsistent with the existence of an easement, HTC cannot rely on Brown's representations of fee ownership to suggest it was promised the Property free of encumbrances.

 ¶ 31 The Lease likewise delivers to HTC "all rights, privileges, easements, and appurtenances" of Brown and "all surface easements, rights, titles, and privileges." The phrase "all rights, privileges, and appurtenances" is a familiar phrase in Utah Property Law, as it is featured on the Special Form Deeds, authorized in the Utah Code. UTAH CODE ANN. §§ 57–1–12, –12.5, & –13 (2010). This phrase occurs not just on the Warranty Deed and Special Warranty Deed forms, *id.* at §§ 57–1–12, –12.5, however, but also on the Quitclaim Deed form, *id.* at § 57–1–13, which states:

A quitclaim deed when executed as required by law shall have the effect of a conveyance of all right, title, interest, and estate of the grantor in and to the premises therein described and *all rights, privileges, and appurtenances* thereunto belonging, at the date of the conveyance.

*Id.* (emphasis added). "A quitclaim deed conveys whatever interest the grantors possess at the time," *United States v. Wooten,* 40 F.2d 882, 884 (10th Cir.1930), which may include any encumbrances upon the property. The analogy to these Lease forms is striking. The phrase "all rights, privileges, and appurtenances," and its corollaries, cannot be said to convey interest free from encumbrances, if

on the evidence that was presented to the court.

**8.** *See Swango Homes, Inc. v. Columbia Gas Transmission Corp.,* 806 F.Supp. 180, 184 (S.D.Ohio 1992) ("An easement implies necessarily a fee in another, and hence it is a right by reason of such ownership to use the land for a special purpose, and one not inconsistent with the general property in the land of the owner of the fee.") (quoting 36 OHIO JUR. 3d, *Easements and Licenses* § 53 (1982)); *see also, North Union Canal Co. v. Newell,* 550 P.2d 178, 179 (Utah 1976) (discussing the "dichotomy of interests" between fee owners of easement owners); DAVID A. THOMAS & JAMES H. BACKMAN, UTAH REAL PROPERTY LAW § 2.02(a)(2) ("The fee simple absolute *may*

*be subject to liens and other charges against it,* but otherwise is not subject to rights held by third parties. An attempted limitation over is repugnant to the grant of a fee simple absolute, *but an easement is not.*") (emphases added); *Kelley v. Tomas,* 66 Conn.App. 146, 783 A.2d 1226, 1235, 1247 (2001) ("[P]laintiff's claim that the court could not have found fee simple ownership of the real property in question when ... the property was encumbered by an easement is without merit. It is well established that the easement has no effect on the plaintiff's fee ownership.... [P]laintiff's contention that property that is owned in fee simple cannot be subject to an easement is absolutely wrong.").

that phrase occurs in the standard form Quitclaim Deed. It should likewise be noted that both the Warranty Deed form and the Special Warranty Deed form contain *express* warranties that the premises are "free from all encumbrances." UTAH CODE ANN. §§ 57–1–11(2)(c)(iv), 12.5(2)(b)(i). Significantly, both the Quitclaim Deed form and the Lease at issue in this case contain no such language. Thus, by analogy to Warranty, Special Warranty, and Quitclaim Deeds under Utah law, the Lease bears perhaps the greatest resemblance to a Quitclaim Deed, and the language of the demise does no more than to convey the interest possessed by Brown at the time of the conveyance—an interest that may have included an easement.

■ ¶ 32 HTC notes that the demise in paragraph 1.1 is subject only to a single Permitted Exception, "Property taxes and Assessments accruing for the year 2005 and thereafter." HTC then notes that the exceptions "relate to the quality of title held by Brown, as landlord, and make no mention of any easement or other encumbrance on the Property." But the Permitted Exceptions are entirely derivative of the quality of title conveyed in the Demise. (The Demise is in paragraph 1.1 of the Lease and the Permitted Exceptions clause is listed just below in 1.1(a)). Brown has simply conveyed all the rights and obligations it has in the Property, subject only to a single permitted exception.

¶ 33 Because there is no warranty that the Property is conveyed free from any encumbrance in the Demise, and because the Permitted Exceptions are derivative of the Demise itself, HTC cannot argue that it was promised a title free from encumbrances. Nor can HTC persuasively assert that there is anything "absurd" (to use HTC's term)—or even inconsistent—about a construction of the Lease that would oblige HTC to quiet title, as the Lease simply does not include any representations about the quality or status of the landlord's title.

C

■ ¶ 34 Having determined that the Lease contains no warranty with respect to the Easement, we next consider whether the Lease assigns to either party the obligation

to quiet title in the event an undisclosed encumbrance is discovered. The provisions of the Lease make clear the parties' intention that HTC would bear the risk of any unforeseen expenses relating to the Property and that, consequently, HTC had the option to either ignore the Lease or to seek to quiet title at HTC's own expense.

¶ 35 The first such Lease provision is the "Compliance with Laws" clause, read together with the corollary definition of "Legal Requirements." These portions of the Lease state:

> 6.3 Compliance with Laws. Subject to the Provisions of Article 8 below [requiring compliance with "Environmental Laws affecting the Premises"], Tenant shall comply with all Legal Requirements in the use, occupation, control and enjoyment of the Premises and in the prosecution and conduct of its business thereon. Tenant shall have the right, at its own cost and expense, to contest or review by appropriate legal or administrative proceeding the validity or legality of any such Legal Requirements, [etc.]

The Tenant is required to comply with both the Legal Requirements defined in the Lease and with Article 8, which deals with "Environmental Matters." The Lease defines these "Legal Requirements" as follows:

> "Legal Requirements" means all present and future laws, statutes, requirements, ordinances, orders, judgments, regulations, administrative or judicial determinations, even if unforeseen or extraordinary, of every governmental or quasi-governmental authority, court or agency claiming jurisdiction over the Premises now or hereafter enacted or in effect (including, but not limited to, Environmental Laws and those relating to accessibility to, usability by, and discrimination against, disabled individuals) and *all covenants, restrictions, and conditions now or hereafter of record which may be applicable to Tenant* or to all or any portion of the Premises, any of the Premises, even if compliance therewith necessitates structural changes to the Improvements or the making of Improvements, or results in interference with the

use or enjoyment of all or any portion of the Premises.

(emphasis added). Under this clause, the Lease specifically provides that if there is a "covenant, restriction, and condition" that "results in interference with the use or enjoyment" of the land, then the Tenant may either accept the interference or exercise the right to challenge it. The question raised by the parties is whether "all covenants, restrictions, and conditions" includes the notion of an easement.

¶ 36 HTC contends that applying the term "covenants, restrictions, and conditions" in the definition above to the easement at issue in this case "ignores the ordinary and established difference between the encumbrance-based term easement and the contract-based nature of covenants, conditions, and restrictions." This argument is facially plausible. At common law, there was a distinction between legally enforceable easements and restrictive covenants enforceable in equity.[9] Restrictive covenants generally restrict the owner's use of the land and include restrictions on residential use, the size or height of buildings, the keeping of animals, etc. David A. Thomas & James H. Backman, Utah Real Property Law § 2.03(b). In cases in which the related phrase "covenants, conditions, and restrictions" or "CC & Rs" has occurred, the restrictions at issue were similar to the land-use restrictive covenants just referenced.[10] In contrast, affirmative easements like the one in the present case permit a particular use by a third party, such as the ingress and egress right recorded on the chain of title for Lot 26.[11] Though Brown rightly observes that "the terms *negative easement* and *restrictive covenant* are often used interchangeably," *Canyon Meadows Home Owners Ass'n v. Wasatch County*, 2001 UT App 414, ¶ 12 n. 5, 40 P.3d 1148 (emphasis added), neither term is employed in the Lease. Nor is the affirmative easement at issue in the present case properly characterized as either a restrictive covenant or a negative easement.[12]

¶ 37 It is not at all clear, however, that the Lease's phrase "covenants, restrictions, and conditions" is a reference to the familiar term "CC & Rs." As Brown observes, the phrase "covenants, conditions, and restrictions" or "CC & Rs" is "nowhere contained in the Ground Lease." Instead, the Lease uses the terms in a different order, referring to "all covenants, restrictions, and conditions now or hereafter of record." Further, of the cases referenced above, in which "CC & Rs" are discussed, the real property at issue was purchased and not subject to a Lease agreement.[13]

¶ 38 Thus, it seems possible that the term "restrictions" was used in a broad, colloquial sense in the Lease to refer to any limitation on the use of the Property. Under this

9. Jeffrey J. Shampo, Covenants § 3, 20 Am. Jur.2d; *see also* RESTATEMENT OF PROPERTY § 6 (1936) ("[E]quitable interests may be destroyed by a transaction which would not result in the destruction of legal interests. Thus an equitable interest in land is destroyed by the transfer of the legal interest in the land to a purchaser for value and without notice of the equitable interest, when a legal interest in land would not be so destroyed.... A is the owner of Blackacre and B is the owner of Whiteacre which adjoins it. A grants an easement of way over Blackacre to B and his heirs and covenants with B that he will not build a garage on Blackacre for ten years. A transfers Blackacre to C, a purchaser for value and without notice of the grant of the easement of way or of the covenant. In the absence of a statute C takes Blackacre subject to the easement of way but free from the restrictions of the covenant.").

10. *See e.g., Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, L.C.*, 2009 UT 65, ¶¶ 3–6, 221 P.3d 234; *Moler v. CW Mgmt. Corp.*, 2008 UT 46, ¶ 2, 190 P.3d 1250; *Dansie v. Hi–Country Estates Homeowners Ass'n*, 1999 UT 62, ¶ 9, 987 P.2d 30.

11. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 (2000) ("An easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.").

12. *See* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 cmt b ("The term 'easement' ... describes an 'affirmative' easement, the right to make use of the land of another. A 'negative' easement, the obligation not to use land in one's possession in specified ways, has become indistinguishable from a restrictive covenant."); *id.* at § 1.3 cmt c ("Negative easements are the same as restrictive covenants; 'negative easement' dropped.").

13. *See supra* note 10.

interpretation, the present Easement would properly be classified as a restriction, in that the easement in question is alleged by HTC to interfere with its ability to secure financing to develop the Property. It is also possible, on the other hand, that the phrase "covenants, restrictions, and conditions" was an inartful invocation of a familiar term of art (CC & Rs). Under that construction, the affirmative easement at issue here may not be expressly implicated.

¶ 39 Ultimately, we need not choose between these two alternative constructions of the phrase "covenants, restrictions, and conditions." Even if the Legal Requirements Clause does not expressly assign the responsibility to HTC to resolve affirmative easements, it is not the only provision of the Lease that expresses the parties' overarching intent to allocate unanticipated costs arising from the Lease to HTC.

¶ 40 Such intent is confirmed in paragraph 3.1 of the Lease. Under this clause, Brown is relieved of the obligation to pay three particular types of expenses: (1) taxes, (2) maintenance, and (3) insurance during the pendency of the agreement.[14] In addition, in the same paragraph, the Lease makes the following sweeping statement:

> [T]enant agrees that the amount of annual rent will be paid without offset and that tenant will pay *all impositions and costs relating to the property* so that the Landlord has *no cost or expense relating to the property* during the term or any extension of the lease.

(emphasis added). This language extends HTC's obligation beyond the three particular expenses contemplated within the "triple net" Clause. It allocates to HTC any impositions, costs, or expenses relating to the Property. There is no limitation to the type of expense referenced, except that it must be related to the Property.

¶ 41 HTC asserts that "triple-net leases are limited to only costs and expenses associated with ongoing *use* of the property." But the Lease does more than relieve Brown of any use obligations under the triple-net provision. It requires HTC to pay all imposi-

tions, costs, and expenses relating to the Property during the term of the Lease. The expense of quieting title to the Property unquestionably "relate[s] to the property," and we accordingly conclude that the parties allocated the burden of that expense to HTC under the Lease.

¶ 42 Because the Lease expressly allocates the burden of any unforeseen expense relating to the Property during the term of the Lease to HTC, the court of appeals correctly concluded that HTC could not compel Brown to quiet title to the Property.

**D**

¶ 43 We also find that HTC has standing to pursue a quiet title action. Under Utah law, "[a] person may bring an action against another person to determine rights, interests, or claims to or in personal or real property." Utah Code Ann. § 78B–6–1301 (2010). Further, parties have standing to bring suit if they can identify an injury that was caused by the defendant and that was redressable by the court. *Brown v. Div. of Water Rights,* 2010 UT 14, ¶ 18, 228 P.3d 747. Unlike the federal requirements for standing, the injury need not be "actual or imminent"; an "actual or *potential*" injury is sufficient. *Cedar Mountain Envtl., Inc. v. Tooele Cnty.,* 2009 UT 48, ¶ 9, 214 P.3d 95 (emphasis added) (citing *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.,* 2006 UT 74, ¶ 23, 148 P.3d 960).

¶ 44 HTC argues that "tenants do not have standing to address ownership interests," and, consequently, the Lease could not possibly be interpreted as requiring that HTC pursue the quiet title action. HTC conspicuously fails to cite a single authority for this proposition. Nor does HTC make any reference to the quiet title statute itself. *See* Utah Code Ann. § 78B–6–1301. Instead, HTC marshals authorities in support of two related, but ultimately distinct, propositions: (1) parties cannot confer standing upon one another by agreement; and (2) standing is a jurisdictional issue, and parties cannot add to or take away from the subject-matter jurisdiction of the court.

14. *See James v. CIR,* 899 F.2d 905, 906 (10th Cir.1990).

¶45 HTC cites three cases for the notion that parties cannot confer standing by contract. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Rosen v. Tennessee Com'r of Finance & Admin.*, 288 F.3d 918, 931 (6th Cir.2002); and *Lacombe v. City of Cheyenne*, 733 P.2d 601, 603 (Wyo.1987). None of these cases says any such thing.

¶46 In *Steel Co.*, the United States Supreme Court addressed the question whether the citizen-suit provision of the Emergency Planning and Community Right–To–Know Act of 1986, authorizes suits for purely past violations, and whether plaintiffs would have standing to challenge such past violations when there could be no effective remedy. 523 U.S., at 85, 118 S.Ct. 1003. The Court determined that because the plaintiffs did not have standing to bring the suit, the Court could not reach the merits of the case. The Court further observed that "[e]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." *Id.* at 95, 118 S.Ct. 1003 (internal quotation marks omitted).[15] There is a difference between parties' inability to "concede" the subject-matter jurisdiction of a Court, however, and the ability of parties to contract for interests sufficient to convey standing. Parties may not add to or take away from the power of the court to hear a particular class of cases; but parties routinely bargain for rights or obligations that may give rise to justiciable claims.

¶47 Likewise inapposite is the holding of the United States Court of Appeals for the Sixth Circuit in *Rosen*. There the court examined the availability of certain benefits for "uninsureables" enrolled in Tennessee's TennCare program. *Rosen*, 288 F.3d at 920–22. The plaintiffs, representing a class of "present and future TennCare applicants and beneficiaries," challenged a change in eligibility requirements that would affect beneficiaries of the program who enrolled after October 1, 2001. *Id.* at 921–22. All of the

plaintiffs had enrolled prior to that date, but argued that they had standing because they were suing on behalf of unnamed members of their class. *Id.* at 923. The case stands for the proposition that a party "must assert his own legal interests, rather than those of third parties." *Id.* at 931 (internal quotation marks omitted). In the present case, HTC does assert its "own legal interests." The Lease grants HTC a present possessory interest in the Property, as well as an option to purchase the Property within five years of the execution of the Lease. HTC has also asserted that the alleged "cloud" on the title of the Property has prevented it from obtaining financing. In suing to quiet title, HTC would therefore be asserting its own interests, and not those of a third party.

¶48 Finally, HTC cites the Wyoming Supreme Court's *Lacombe* case in which that court stated, "We do not permit parties to confer standing by agreement." *Lacombe*, 733 P.2d at 603. But the agreement at issue in *Lacombe* is not a contract. Instead, in *Lacombe*, a criminal defendant challenged the constitutionality of a Wyoming law that "inhibits the authority of the prosecuting attorney to enter into plea bargains." *Id.* at 602. This inhibition, the defendant claimed, was "an unconstitutional invasion by the legislative branch of government of the prerogatives of the executive branch." *Id.* The municipality simply stipulated that prior to the passage of the Wyoming law, the defendant would have been permitted to enter a plea. *Id.* at 603. This is what was meant by the prohibition on finding standing by agreement. A criminal defendant did not have standing to raise a separation of powers issue on behalf of the municipality simply because the municipality stipulated that under preexisting law the defendant would have been able to enter a plea.

¶49 The notion that "standing cannot be conferred by contractual agreement" is far from "established law." HTC cites no case suggesting that parties cannot grant, by agreement, legal interests sufficient to confer standing. And in fact, the authority support-

---

**15.** There was no contract at issue in *Steel Co.*, nor was standing assigned to one party or another based upon any contract or agreement. Instead, the standing argument was derived from a federal statute. *Steel Co.*, 523 U.S at 87–88, 118 S.Ct. 1003.

ing standing by contractual assignment of legal interests is plentiful.

 ¶ 50 "[T]he law favors the assignability of contractual rights," *Clark v. Shelton,* 584 P.2d 875, 877 (Utah 1978) and there are a number of circumstances in which standing may be contractually obtained. A party may assign its right to sue for breach of contract. *Hamilton v. Maryland Casualty Co.,* 27 Cal.4th 718, 117 Cal.Rptr.2d 318, 41 P.3d 128, 132 (2002); *Deatsch v. Fairfield,* 27 Ariz. 387, 397–98, 233 P. 887, 891 (Ariz. 1925). A third party may also acquire a contractual interest in another's tort claim, *e.g.,* through subrogation. *See* UTAH CODE ANN. § 31A–21–108 (2010); *State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co.,* 912 P.2d 983, 985 (Utah 1996). There is accordingly no reason to doubt the ability of the parties to the Lease to assign the right to sue to quiet title to HTC.

¶ 51 HTC also observes that "standing is a jurisdictional requirement" and asserts that "parties cannot, by agreement, confer jurisdiction upon the court." *See Phoenix Indemnity Ins. v. Smith,* 2002 UT 49, ¶ 5, 48 P.3d 976. Neither of the propositions is controversial, nor are they relevant to the present inquiry. There is no suggestion that the agreement at issue seeks to "confer jurisdiction" in the sense in which those terms are used in the case law.

¶ 52 The question presented in this case has never been whether or not a Utah court would have jurisdiction to adjudicate the contemplated quiet title action. If that had been the question, the answer could have been easily resolved. The parties here are both Utah-registered limited liability companies, and the land in question is located within the boundaries of the state. District judges are granted "original jurisdiction in all matters civil and criminal" by the Utah Constitution and by statute. UTAH CONST. art. VIII, § 5; UTAH CODE ANN. § 78A–5–102 (2010). While it is true that parties may not add to or subtract from that power by agreement or

stipulation, that is an altogether different question from whether the parties may, by negotiating the terms of a contract, grant to one another sufficient stake in the outcome of a dispute to satisfy the standing requirement.

¶ 53 Through the Lease, HTC acquired a present possessory interest in Lot 27. The existence of the undisclosed easement presented a potential injury to HTC, and in light of HTC's alleged failure to secure financing for the improvements, the Easement also caused an actual injury—one easily redressable by a quiet title order. The quiet title statute does not limit the availability of the quiet title action to fee owners. The statute says simply that *"[a] person* may bring an action against another person to determine rights, interests, or claims to or in personal or real property." UTAH CODE ANN. § 78B–6–1301 (2010) (emphasis added). Whatever the semantic range of the terms "person" and "interest" in the statute, we have little trouble concluding that a tenant to a long-term ground lease that contemplates the construction of a shopping center and that contains an option to purchase after five years for which consideration is paid falls comfortably within the ambit of the statute.

 ¶ 54 "Standing to bring a quiet title action to perfect title is limited to parties who could acquire an interest in the property created by the court's judgment or decree." *Elder v. Nephi,* 2007 UT 46, ¶ 20, 164 P.3d 1238. The cases relied upon the *Elder* Court, however, were cases involving plaintiffs with *no* interest-not a present, possessory leasehold interest in the land in question.[16] HTC's characterization of the *Elder* rule as designed "to ensure that any court order in a quiet title action actually awards title to one of the parties," overstates this Court's holding, which limits standing to "those who could acquire *an interest,"* not those who could acquire title. This holding is consistent with the role of the quiet title statute, which is simply "to determine, rights, interests, or claims" of the parties. UTAH CODE

---

16. *See Andrus v. Bagley,* 775 P.2d 934, 935 (Utah 1989) ("Because [plaintiff] had no interest, he had no standing to bring the [quiet title] action."); *Pender v. Bird,* 119 Utah 91, 224 P.2d 1057, 1060 (1950) ("[P]laintiff's connection with the record title was through a deed which conveyed nothing. Therefore he had no standing in court to object to a decree quieting defendants' title against him.").

ANN. § 78B–6–1301. HTC has not cited a single case for the proposition that lessees lack standing to quiet title. Such suits have in fact been allowed, but fly under the radar because they are uncontroversial. *See* 51 A.L.R.2d 1227, at \*2 ("[M]any cases brought by lessees as complainants were entertained by courts without the plaintiff's status as lessee being put at issue."). Rather than acting "in contravention of law and sound public policy," a holding recognizing the standing of lessees to quiet title would be consistent with a rule of law that is elsewhere considered both traditional and quotidian. *Id.* ("[A] suit to quiet title may be maintained *by a lessee against any person* ... who claims an adverse estate or interest in the leasehold, for the purpose of determining the adverse claim.").[17]

¶ 55 HTC acquired a present possessory interest in the Property and contracted for an option to purchase and to build permanent improvements on the Property. Because standing to quiet title is conferred on "person[s]" with an interest in "real property," we conclude that HTC had standing to quiet title on the Property.

### III

¶ 56 The court of appeals correctly concluded that Brown was under no obligation under the Lease to quiet title to Lot 27 to remove the alleged cloud created by the purported Easement. Because HTC had standing to quiet title under Utah's quiet title statute and a contractual responsibility to cover any expenses relating to the Property under the Lease, the judgment of the court of appeals is affirmed.

¶ 57 Associate Chief Justice DURRANT, Justice PARRISH, Justice NEHRING, and Judge HOWARD concur in Justice LEE's opinion.

---

**17.** *See also Willing v. Chicago Auditorium Ass'n,* 277 U.S. 274, 48 S.Ct. 507, 72 L.Ed. 880 (1928); *German–American Savings Bank v. Gollmer,* 155 Cal. 683, 102 P. 932 (1909); *Upchurch v. Sutton Bros.,* 142 Ky. 420, 134 S.W. 477 (1911); *Webster*

¶ 58 Having disqualified herself, Chief Justice DURHAM did not participate herein; District Court Judge FRED D. HOWARD sat.

*v. Tuttle,* 83 Me. 271, 22 A. 167 (1891); *Peterson v. Vak,* 160 Neb. 450, 70 N.W.2d 436 (1955); *Cooper v. Gordon,* 37 N.D. 247, 164 N.W. 21 (1917).